UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LOUIS PICCONE and ELENA PICCONE, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civ. No. |
| ) | |
| ANGELO MCCLAIN, LYNNE REBER, ) | |
| JOAN MAZZEO, HEATHER NIETSCHE, ) | |
| IRENE WOODS, LANCE LAPOINTE ) | |
| JANET RICE, ) | |
| ) | |
| JOHN W. BARTELS, JR., JOHN M. MARLEY, ) | |
| TOWN OF DALTON, and ) | |
| ) | |
| RICHARD SMITH, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT AND JURY DEMAND

Plaintiffs Louis and Elena Piccone, by undersigned counsel, bring this action against Defendants and allege as follows:

## INTRODUCTION

1.      In January 2008, Plaintiffs Louis and Elena Piccone were living with their three children in Dalton, Massachusetts, leading an idyllic small-town life. The Piccones' happiness was shattered when the Massachusetts Department of Children and Families ("DCF") received an uncorroborated, totem-pole hearsay report that Mr. Piccone's three-year-old son had allegedly said something suggesting that he had been abused by Mr. Piccone.

2.      Based on that one alleged "statement," DCF and the Dalton Police began a witch-hunt against Mr. and Mrs. Piccone that ultimately resulted in Mrs. Piccone being forced to leave the country with her children and Mr. Piccone being thrown in jail.  During the course of their investigation, the Dalton Police repeatedly searched the Piccones' home without a warrant, and conducted other searches pursuant to warrants that were obtained by misrepresenting and omitting critical facts to the issuing judicial officer.  Similarly, DCF obtained legal custody of the Piccone children by filing an *ex parte* custody petition that misrepresented and omitted critical facts.

3.      As a result of these actions, Mr. and Mrs. Piccone have been deprived of their federal and state constitutional rights, have incurred hundreds of thousands of dollars in legal fees, and have suffered irreparable mental anguish, emotional distress, embarrassment, and damage to their reputations.

4.      This is an action for damages and injunctive and declaratory relief based on DCF's and Dalton Police's repeated violations of Mr. and Mrs. Piccone's federal and state constitutional rights.

## PARTIES

### *Plaintiffs*

5.      Plaintiff Louis Piccone is a resident of Dalton, Massachusetts.  He is a licensed attorney admitted to practice in the Commonwealth of Pennsylvania and before the U.S. Patent Bar.

6.      Plaintiff Elena Piccone is a Russian citizen with permanent resident alien immigration status in the United States.

7.     Plaintiffs Louis and Elena Piccone are husband and wife.  Together, they have three children: Child A, Child B, and Child C.  In January 2008, Child A was seven years old, Child B was five years old, and Child C was three years old.

### Defendants

### Department of Children and Family ("DCF")[1] Defendants

8.     Defendant Angelo McClain is the Commissioner of DCF.  McClain is being sued solely in his official capacity.

9.     Defendant Lynne Reber is a resident of Berkshire County, Massachusetts.  At all relevant times, Reber was an intake screener at DCF and was acting under color of law.  Reber is being sued solely in her individual capacity.

10.    Defendant Joan Mazzeo is a resident of Berkshire County, Massachusetts.  At all relevant times, Mazzeo was an area program manager at DCF and was acting under color of law.  Mazzeo is being sued solely in her individual capacity.

11.    Defendant Heather Nietsche is a resident of Berkshire County, Massachusetts.  At all relevant times, Nietsche was employed as a social worker for DCF and was acting under color of law.  Nietsche is being sued solely in her individual capacity.

12.    Defendant Irene Woods is a resident of Berkshire County, Massachusetts.  At all relevant times, Woods was employed as a supervisor for DCF and was acting under color of law.  Woods is being sued solely in her individual capacity.

---

[1]     DCF changed its name from the Department of Social Services ("DSS") to the Department of Children and Families on July 8, 2008—during the course of events described in the Complaint.  For simplicity, Plaintiffs will refer the agency as DCF, even though many of the events described herein took place while DCF was still operating as DSS.

13.     Defendant Lance LaPointe is a resident of Berkshire County, Massachusetts.   At all relevant times, LaPointe was employed as an area program manager for DCF and was acting under color of law.  LaPointe is being sued solely in his individual capacity.

14.     Defendant Janet Rice is a resident of Berkshire County, Massachusetts.   At all relevant times, Rice was employed as a supervisor for DCF and was acting under color of law. Rice is being sued solely in her individual capacity.

*Town of Dalton Defendants*

15.     John W. Bartels, Jr. is a resident of Berkshire County, Massachusetts.  At all relevant times, Bartels was the Chief of Police of the Dalton Police Department and was acting under color of law.  Bartels is being sued solely in his individual capacity.

16.     Defendant John M. Marley is a resident of Berkshire County, Massachusetts.  At all relevant times, Marley was a police officer with the Dalton Police Department and was acting under color of law.  Marley is being sued solely in his individual capacity.

17.     Defendant Town of Dalton is a Massachusetts municipal organization located in Berkshire County.  At all relevant times, the Town of Dalton was the employer of Defendants John W. Bartels, Jr. and John M. Marley.  As the Chief of the Dalton Police, Defendant Bartels was the final policymaker for the Town of Dalton with respect to its police department.

*Massachusetts State Police Defendant*

18.     Defendant Richard Smith is a police officer with the Massachusetts State Police and at all relevant times was acting under the color or law.  Smith is being sued solely in his individual capacity.

## JURISDICTION AND VENUE

19.    This Court has subject-matter jurisdiction over Plaintiffs' federal claims under 28 U.S.C. §§ 1331, 1343(a)(3), and 42 U.S.C. § 1983, and has subject-matter jurisdiction over Plaintiffs' Massachusetts state-law claims under 28 U.S.C. § 1367(a).

20.    This Court has personal jurisdiction over all Defendants under Mass. Gen. Laws ch. 223A, § 2 because all Defendants are either domiciled in or organized under the laws of the Commonwealth of Massachusetts.  The Court also has personal jurisdiction over all Defendants under Mass. Gen. Laws ch. 223, § 3 because all Defendants committed acts or omissions within Massachusetts that caused tortious injuries to Plaintiffs.

21.    Venue is proper in the District of Massachusetts under both 28 U.S.C. § 1391(b)(1) (because all Defendants reside within this district) and 28 U.S.C. § 1391(b)(2) (because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district).

## FACTS

22.    DCF is a Massachusetts state agency organized under Mass. Gen. Laws ch. 18B charged with "provid[ing] and administer[ing] a comprehensive child welfare program for children and families."  DCF's responsibilities include, among other things, receiving reports of suspected child abuse or neglect and investigating those reports.

23.    During the fall of 2007, Plaintiff Louis Piccone—who is an attorney licensed to practice in Pennsylvania and before the U.S. the Patent Bar—began assisting a Massachusetts attorney defend a day care center in Pittsfield, Massachusetts against allegations of child neglect made by EEC.

24.     On or about Friday, January 4, 2008, Mr. Piccone had communication with Constantia Papanikolaou, General Counsel of the Massachusetts Department of Early Education and Care ("EEC"), during which he informed her that based on EEC's application of the law, it would be necessary to file a federal lawsuit challenging the constitutionality of Mass. Gen. Laws ch. 119, §§ 51A-51B—two Massachusetts statutes under which both DCF and EEC operate.

*Day 1: Friday, January 11, 2008*

25.     On Friday, January 11, 2008, just one week after Mr. Piccone's discussion with EEC about a potential constitutional challenge to Mass. Gen. Laws ch. 119, §§51A-51B, Defendant Lynne Reber, an intake screener at DCF, received a call alleging that Child C—Mr. Piccone's three-year-old son—had made statements suggesting that he had been abused by Mr. Piccone.

26.     The reporter later submitted a written complaint, known as a 51A report, which essentially repeated the allegations the reporter made during the phone call with Reber.

27.     Importantly, the reporter did not make <u>any</u> allegations about Plaintiff Elena Piccone, either in the phone call to Reber or in the written 51A report.

28.     Similarly, the reporter did not make any allegations about Child A or Child B— the Piccones' other two children.

29.     Incredibly, even though the reporter's allegations did not involve Child A or Child B and did not concern Mrs. Piccone, Reber included in her intake report charges of neglect against Mrs. Piccone with respect to all three of her children: Child A, Child B, and Child C.

30.     Likewise, even though the reporter's allegations did not involve Child A or Child B, Reber included in her intake report charges of neglect against Mr. Piccone with respect to both Child A and Child B.

31.     Reber knew that the reporter was not a witness to Child C's alleged statements concerning Mr. Piccone, and that in fact, the reporter had not even spoken with Child C about Child C's alleged statements.

32.     Similarly, Reber also knew that the people who, according to the reporter, did hear Child C's alleged statements were "mandated reporters"—*i.e.,* they were required by Massachusetts law to report allegations of child abuse to DCF—but that these mandated reporters had not contacted DCF.  Moreover, Reber also knew that the reporter had not herself spoken with the people who had supposedly heard Child C's alleged statements.

33.     Despite knowledge of the facts described in Paragraphs 31 and 32, Reber failed to include any of this information in her intake report.

34.     Reber designated the reporter's complaint an "emergency," meaning that DCF would begin an immediate investigation.

35.     Defendant Joan Mazzeo, an area program manager at DCF, reviewed and approved Reber's intake report.

36.     Defendant Heather Nietsche and Kathleen Vittum, social workers at DCF, were assigned to investigate the allegations involving Mr. Piccone.

37.     As of January 11, 2008, Nietsche was not a licensed social worker in Massachusetts, and thus, she was not authorized to engage in clinical social work in Massachusetts.

38.     Nietsche and Vittum arrived at the Piccones' home in Dalton, Massachusetts at approximately 8:30 p.m.  They were accompanied by two Dalton police officers.

39.     After Nietsche and Vittum identified themselves, Mr. Piccone invited them into his home so that he could learn more about why they were there.

40.     Just as Nietsche, Vittum, and the two officers were entering the Piccones' home, Child C entered the kitchen.

41.     One of the officers, Sergeant Lawrence Higgins, observed that Child C was "clean and had no sign of injuries."

42.     Likewise, Nietsche did not see any signs of abuse on Child C, nor did she believe that Child C was in any immediate danger.

43.     Nietsche and Vittum explained the allegations of abuse to Mr. Piccone.

44.     Mr. Piccone adamantly denied the allegations.

45.     In denying the allegations, Mr. Piccone emphasized that the statements attributed to Child C included language that Child C would not use.  According to the reporter, Child C stated that "Daddy" had hurt Child C with "his privates."  But Child C would not refer to Mr. Piccone as "Daddy," nor would he use the word "privates."  Instead, Child C would refer to Mr. Piccone as "Papa" or "Lou," and would use a Russian term to describe a man's genital area (Mrs. Piccone is Russian).

46.     Nietsche then asked to interview Child C, even though DCF's own regulations provide only that the child be viewed—which Child C already had been by both Nietsche and Sergeant Higgins.

47.     As of January 11, 2008, Nietsche was not competent to engage in clinical social work in Massachusetts.

48.     As of January 11, 2008, Nietsche had no training about when it is appropriate to interview a child and had not reviewed any literature about when it is appropriate to interview a child.  Stated simply, Nietsche did not know when it would be appropriate to interview a three-year-old child like Child C.

49.     Similarly, as of January 11, 2008, Nietsche had no training about how to properly interview a child, and she had not reviewed any literature about how to properly interview a child.  Stated simply, Nietsche did not know how to properly interview a three-year-old child like Child C.

50.     Although, unbeknownst to Mr. Piccone at the time, Nietsche was wholly unqualified to interview Child C, Mr. Piccone agreed to permit Child C to be interviewed on the condition that the interview be videorecorded.

51.     Moreover, Mr. Piccone also offered to undress Child C so that Nietsche, Vittum, and the officers could verify that Child C was clean, well-fed, and free from bruises, cuts, scratches, and other indicia of physical or sexual abuse and neglect—again, on the condition that the examination be videorecorded.

52.     Given that Mr. Piccone was actively involved in litigation with DCF and had stated—just one week earlier—that he would soon be challenging the constitutionality of several statutes under which DCF operates, Mr. Piccone feared that DCF's actions may have been retaliatory.

53.     Mr. Piccone requested that DCF document its investigation by videotaping any interviews and/or examinations of Child C or his other children.  As Mr. Piccone later explained, doing so would ensure that DCF's investigation was fully and properly documented and would

avoid the possibility that any subsequent proceedings would degenerate into a "he-said/she-said" dispute.

54.    Nietsche refused to permit any interview to be videorecorded, telling Mr. Piccone that "DSS [*i.e.*, DCF] doesn't do video."

55.    Nietsche and Vittum then spoke with their supervisor, Defendant Irene Woods, who, upon information and belief, had conferred with Defendant Lance LaPointe about the situation.  Upon information and belief, Woods and LaPointe approved Nietsche's refusal to permit any interview to be videorecorded.

56.    There is no Massachusetts law, regulation, or written DCF policy which would prohibit an interview of Child C to be videorecorded.

57.    Nietsche also told Mr. Piccone that if he refused to permit an unrecorded interview of all three Piccone children, DCF would take immediate custody of all three children.  Upon information and belief, Woods and LaPointe approved this decision.

58.    Mr. Piccone then spoke with an attorney.  The attorney also spoke with Nietsche and Vittum.

59.    Nietsche then gave Mr. Piccone an ultimatum: if he did not permit an unrecorded interview of all three children or agree to leave the house for the weekend, DCF would take immediate physical custody of all three children.  Upon information and belief, Woods and LaPointe approved the decision to present Mr. Piccone with this ultimatum.

60.    Left without any real choice, Mr. Piccone was forced to "agree" to leave his home for the weekend so that DCF would not take custody of his children.

61.    Defendant Nietsche then attempted to force Mr. Piccone to sign an "Interim Service Plan," which is a written document that outlines goals and tasks for families receiving services from DCF.

62.    Mr. Piccone refused to sign the "Interim Service Plan." Instead, he wrote on it: "I am being forced to sign this agreement or else my three children will be taken this evening to foster care. I offered to completely cooperate on condition that any interaction of my children be videorecorded. I was told 'DSS [*i.e.*, DCF] doesn't do video.'"

63.    Mr. Piccone then left, as did Nietsche, Vittum, and the two Dalton police officers; Mrs. Piccone remained in the home with all three Piccone children.

64.    Mrs. Piccone remained as custodian and caretaker of the three Piccone children with the full knowledge and consent of DCF, including Defendants Nietsche, LaPointe and Woods (and Vittum).

65.    DCF—specifically including Nietsche, LaPointe, Woods, and Vittum—elected to keep the three Piccone children with their mother in their home.

66.    During the nearly two hours that DCF was at the Piccone home on January 11, 2008, no DCF official raised any allegations about Mrs. Piccone or expressed any concerns about leaving the three Piccone children with Mrs. Piccone.

67.    By refusing to allow a videotaped interview to take place, DCF put its own interests above the interests of the child.

68.    Sometime after leaving the Piccones' home, DCF downgraded its investigation from an "emergency" to a "non-emergency."

*Day 2: Saturday, January 12, 2008*

69.     The next morning, Saturday, January 12, 2008, Mrs. Piccone brought her three children to see Dr. Richard Rosenfeld.

70.     Dr. Rosenfeld is a medical doctor, licensed to practice in Massachusetts, and board-certified in pediatrics since the late 1970s.  He has extensive experience in pediatric medicine.

71.     Mrs. Piccone told Dr. Rosenfeld about the allegations that Mr. Piccone had abused Child C.

72.     Dr. Rosenfeld conducted a comprehensive sexual abuse examination of Child C.

73.     Dr. Rosenfeld cleared the child of physical or sexual abuse, stating "normal PE [physical examination]/behavior here" in his medical note.

74.     Following his examination of Child C, Dr. Rosenfeld called DCF to report that he had examined Child C, and that there were no signs of abuse on Child C.


*Day 4: Monday, January 14, 2008*

75.     On Monday, January 14, 2008, Mr. Piccone's attorney called Defendant Nietsche to ask for a copy of the complaint against Mr. Piccone.  He was told that the report was not yet finalized.

76.     Mr. Piccone's attorney also faxed Dr. Rosenfeld's examination notes to DCF.

77.     Sometime on January 14, 2008, Nietsche spoke with Dr. Rosenfeld, who informed her that he had examined Child C and not detected any signs of abuse.

78.     Hence, by the close of business on January 14, 2008, DCF had actual notice that Child C had not suffered any sexual abuse—a fact corroborated by both Dr. Rosenfeld's

examination of Child C and Nietsche's and Sergeant Higgins's first-hand observations of Child C.

*Day 5: Tuesday, January 15, 2008*

79.     On Tuesday, January 15, 2008, Mr. Piccone and his attorney met with Defendants LaPointe, Rice, and Nietsche.

80.     At the meeting, LaPointe, Rice, and Nietsche acknowledged that DCF had received Dr. Rosenfeld's report.

81.     Mr. Piccone again expressed his willingness to permit DCF to interview his children, provided that the interviews were videorecorded.  Mr. Piccone also offered to pay for the cost of any recordings, including transcription costs.

82.     As Mr. Piccone explained at the meeting, he wanted a complete record of the exact language used by all parties involved with the investigation to ensure that any subsequent proceedings would not degenerate into a "he-said/she-said" dispute.

83.     LaPointe, Rice, and Nietsche refused to agree to videotape any interviews of the Piccone children.

84.     LaPointe, Rice, and Nietsche informed Mr. Piccone that DCF had scheduled a Sexual Assault Intervention Network ("SAIN") interview for the next day, Wednesday, January 16, 2008.

85.     A SAIN interview is intended to help coordinate and track the investigation, treatment, and prosecution of suspected child abuse cases.  A SAIN team typically includes personnel from DCF, law enforcement, and the local district attorney's office.

86.     LaPointe, Rice, and Nietsche told Mr. Piccone that if he did not cooperate with the SAIN interview and agree to stay out of his home and away from his children "indefinitely," DCF would have custody of the Piccone children removed to DCF.

87.     The meeting ended when LaPointe stood up, held his palms out at his side, and stated that if Mr. and Mrs. Piccone were not going to agree to DCF's demands, then "let's get to it."

88.     During this meeting, Mrs. Piccone was—for the first time—accused of neglect, but tellingly, LaPointe, Rice, and Nietsche did not allege a single fact in support of this entirely conclusory accusation.

89.     On the afternoon of January 15, 2008, Mrs. Piccone and her three children traveled to New York City.

90.     At the time Mrs. Piccone left Massachusetts with her children, no care and protection petition had been filed regarding any of the Piccone children, and there were no criminal charges pending against either Mr. or Mrs. Piccone.


### Day 6: Wednesday, January 16, 2008

91.     On Wednesday, January 16, 2008, Defendant Nietsche spoke with the Piccone children's regular pediatrician, Dr. Alan Kulberg.  Dr. Kulberg told Nietsche that he had never had any concerns that any of the Piccone children had been abused.

92.     At approximately 1:30 p.m. that day, Mr. Piccone's attorney notified Nietsche that Mrs. Piccone and the Piccone children were visiting family in New York.

93.     As of that conversation, DCF had notice that Mrs. Piccone and the three Piccone children were out of Massachusetts.

<u>DCF Unlawfully Obtains Custody of the Piccone Children</u>

94.    On January 16, 2008, Defendants Nietsche, Rice, and LaPointe conferenced the case with DCF counsel.

95.    At approximately 3:00 p.m. that day, Nietsche filed an *ex parte* emergency care and protection petition (the "Petition") with the Massachusetts Juvenile Court seeking to have DCF take custody of all three Piccone children.

96.    Upon information and belief, Defendants Rice and LaPointe approved this action.

97.    At the time the Petition was filed, Nietsche, Rice, and LaPointe knew the following facts:

   a.    Mr. and Mrs. Piccone were willing to have their children interviewed by DCF on the condition the interviews be videorecorded;

   b.    Child C had been cleared of abuse after being thoroughly examined by a physician;

   c.    Nietsche and Vittum had observed Child C on January 11, had not seen any signs of abuse, and had downgraded the status of DCF's investigation from emergency to non-emergency;

   d.    there were no allegations of abuse or neglect involving Child A or Child B;

   e.    there were no factual allegations that Mrs. Piccone had abused her children (only a conclusory and entirely unsupported allegation of neglect); and,

      f.      the Piccone children were lawfully outside the jurisdiction of the Massachusetts courts.

98.    Despite all this knowledge, Nietsche stated in a sworn affidavit in support of the Petition (which was co-signed by Rice, and upon information and belief, had been approved by LaPointe) that all three Piccone children "are without necessary and proper care; that they are growing up under conditions or circumstances damaging to their sound character development; that they lack the proper attention of their parents; and that their parents are unwilling, incompetent or unavailable to provide such care and attention. [DCF] further requests that the Court find that [DCF] made reasonable efforts, but based upon the emergency nature of the situation, and in order to protection [sic] the children's health and safety, reasonable efforts could not have prevented the need to remove these children" (emphasis added).

99.    In her affidavit (which was co-signed by Rice, and upon information and belief, had been approved by LaPointe), Nietsche knowingly omitted a number of critical facts:

      a.    Nietsche failed to inform the Juvenile Court that Child C had been cleared of abuse after being thoroughly examined by a physician—a fact that Nietsche herself has admitted would have been important for the Court to hear in ruling on the Petition;

      b.    Nietsche failed to inform the Juvenile Court that she and Vittum had observed Child C on January 11, and had not seen any signs of abuse;

      c.    Nietsche claimed that the Piccone children were in an "emergency" situation, but failed to inform the Juvenile Court that DCF had itself previously downgraded the status of its investigation from emergency to non-emergency; and,

    d.   Nietsche failed to inform the Juvenile Court that she had been told that all three Piccone children had left Massachusetts and therefore were lawfully outside the jurisdiction of the Massachusetts courts.

100.    Nietsche has admitted that the stated basis for the filing of the Petition—*i.e.*, the DCF conclusion of neglect by Mr. and Mrs. Piccone—was unfounded, and that there was no emergency involving the Piccone children during the period January 11-16, 2008 that required court intervention.

101.    In filing the Petition, LaPointe, Nietsche, and Rice acted in bad faith and with actual malice.

102.    After reviewing the Petition *ex parte* (and therefore not knowing about the misrepresentations and omissions in Nietsche's affidavit), the Juvenile Court awarded custody of all three Piccone children to DCF.

### Day 7: Thursday, January 17, 2008

103.    At approximately 2:00 p.m. on Thursday, January 17, 2008, Defendant Nietsche (accompanied by two Dalton police officers and another DCF social worker) arrived at the Piccones' home with a notice that DCF had filed a care and protection case in Juvenile Court, and that Mr. Piccone was required to attend a hearing in Juvenile Court the next day.

104.    Nietsche stated to Mr. Piccone that she (as opposed to DCF) had obtained custody of the three Piccone children.  Mr. Piccone asked to see a copy of the order granting DCF custody.

105.    Nietsche did not produce the order.

106.    While Mr. Piccone was eventually served with a copy of the custody order, Mrs. Piccone was never served with a copy of the order or notice of the care and protection proceeding.

*Week 2: Friday, January 18, 2008 - Thursday, January 24, 2008*

107.    On Friday, January 18, 2008, Mr. Piccone, through counsel, filed a motion to dismiss the care and protection case because the Piccone children were lawfully outside of Massachusetts before DCF filed the *ex parte* Petition seeking custody of the Piccone children, having left with their mother on January 15, 2008, and because DCF knew of this fact before it filed the Petition.

108.    Mr. Piccone's motion to dismiss again provided notice to all reviewing parties, including DCF, the Dalton Police and the Berkshire County District Attorney's Office, that Mrs. Piccone and all three Piccone children had lawfully left Massachusetts before the care and protection case was filed.

109.    On Saturday, January 19, 2008, Mr. Piccone's father, Dr. Vincent A. Piccone, Jr., faxed a letter to the Juvenile Court—which then became available to all reviewing parties, including DCF, the Dalton Police and the Berkshire County District Attorney's Office—that "on Tuesday, January 15, 2008, [Mrs. Piccone and the Piccone children] came to [his] large and comfortable home [in New York] where there are many family members to help [Mrs. Piccone] and cousins for the children to play with."

110.    Dr. Piccone's letter again provided notice to all reviewing parties, including DCF, the Dalton Police and the Berkshire County District Attorney's Office, that Mrs. Piccone and all

three Piccone children had lawfully left Massachusetts before the care and protection case was filed.

111.    Upon information and belief, Defendant John Bartels, the Chief of the Dalton Police, ordered a Dalton Police officer to enlist the Piccones' next-door neighbor as a spy to call the police whenever the neighbor saw a car in the Piccones' driveway.

*Week 3: Friday, January 25, 2008 - Thursday, January 31, 2008*

The First Illegal Search: Dalton Police Conduct a Warrantless Search of the Piccones' Home

112.    At approximately 1:30 p.m. on January 25, 2009, Defendant Bartels, accompanied by two Dalton Police officers, went to the Piccones' home.

113.    None of the Piccones' cars were in the driveway.

114.    Bartels and the officers knocked on the Piccones' front and back doors and rang the Piccones' doorbell, but no one answered.

115.    Based on the information known to Bartels and the officers—including the fact that there were no cars in the Piccones' driveway and no one was answering the door—Bartels and the officers knew or should have known that no one was home.

116.    Bartels and the officers did not have a search warrant, nor did they have probable cause to support a warrant if they had sought one.

117.    There were no exigent circumstances that would justify a warrantless search of the Piccones' home.

118.    Despite all this, Bartels and the officers entered the Piccones' garage and then let themselves into the living quarters of the Piccones' home.

119.    Bartels and the officers then conducted a warrantless search of the Piccones' home.

120.    Upon information and belief, the Dalton Police have a policy or practice of routinely entering private citizens' homes under the so-called "community caretaker" role.


The Second Illegal Search: The Dalton Police Conduct a Warrantless Search of the Piccones' Home

121.    Upon information and belief, at approximately 4:00 p.m. on January 27, 2009, the Piccones' next-door neighbor called the Dalton Police and stated that there was a car in the driveway at the Piccones' home.

122.    Shortly thereafter, Defendant Marley, a Dalton Police officer, arrived at the Piccones' home, accompanied by another Dalton Police officer.

123.    When he arrived, Marley encountered a man named John Nolan, a convicted felon and former client of Mr. Piccone's.

124.    After speaking with Nolan, Marley entered the Piccones' home and conducted a warrantless search of the home.

125.    Marley did not have a search warrant, nor did he have probable cause to support a warrant if he had sought one.

126.    There were no exigent circumstances that would justify a warrantless search of the Piccones' home.

127.    Subsequently, Marley attempted to justify his warrantless search of the Piccones' home by claiming that Nolan had said that he was Mr. Piccone's brother-in-law and that Nolan had supposedly consented to the search.

128.    Nolan is not Mr. Piccone's brother-in-law, and never has been Mr. Piccone's brother-in-law.

129.    Nolan did not have authority to give valid consent to a search of the Piccones' home.

130.    Marley had never met Nolan before, and had no knowledge of the relationship—if any—between Nolan and Mr. and Mrs. Piccone.

131.    Upon information and belief, aside from speaking with Nolan, Marley did nothing to learn about the relationship—if any—between Nolan and Mr. and Mrs. Piccone.

132.    Upon information and belief, aside from speaking with Nolan, Marley did nothing to confirm whether Nolan had authority to consent to a search of the Piccones' home.

133.    Upon information and belief, on various dates, the Dalton Police subsequently conducted seven to ten additional warrantless searches of the Piccones' home.

Criminal Complaints and Arrest Warrants are Issued for Mr. and Mrs. Piccone Based on Dalton Police Chief Bartels's False and Misleading Application for a Criminal Complaint

134.    On or around January 29, 2008, DCF shared all of its information with the Dalton Police and the Berkshire County District Attorney's Office.

135.    That same date, Defendant Bartels applied for and received criminal complaints and arrest warrants for three counts of parental kidnapping against Mr. and Mrs. Piccone.

136.    At the time Bartels sought the complaints and warrants, he knew the following facts:

a.    Mr. and Mrs. Piccone were willing to have their children interviewed by DCF on the condition that the interviews be videorecorded;

b.      Child C had been cleared of abuse after being thoroughly examined by a physician;

c.      Nietsche and Vittum had observed Child C on January 11, had not seen any signs of abuse, and had downgraded the status of DCF's investigation from emergency to non-emergency;

d.      one of Bartels's own officers had also seen Child C on January 11, and observed that Child C was "clean and had no sign of injuries";

e.      there were no allegations of abuse or neglect involving Child A or Child B;

f.      there were no factual allegations that Mrs. Piccone had abused her children (only a conclusory and entirely unsupported allegation of neglect); and,

g.      the Piccone children were lawfully outside the jurisdiction of the Massachusetts courts at the time custody was awarded to DCF.

137.    Upon information and belief, at the time Bartels sought the complaints and warrants, he knew that Massachusetts's parental-kidnapping statute, Mass. Gen. Laws ch. 265, § 26A, does not criminalize the act of a parent taking his or her child out of the Commonwealth unless there is a valid custody order divesting the parent of custody.

138.    In his application for a criminal complaint and arrest warrant, Bartels failed to mention the crucial fact that Mrs. Piccone and the Piccone children had lawfully left the Commonwealth before DCF ever sought custody of the Piccone children.

139. Bartels also failed to mention that Mrs. Piccone had actual custody of the children and had never been served with a court order removing custody from her, nor had she been served with notice of the care and protection proceeding.

140. Accordingly, upon information and belief, Bartels knew that there was not probable cause to support parental-kidnapping charges against Mr. and Mrs. Piccone, but he intentionally—and with malice—sought charges against them anyway.

141. In his application for a criminal complaint, Bartels falsely stated that "the children have not been in the area, or their whereabouts known since 01-17-08." In fact, Mrs. Piccone and the three Piccone children had left for New York on January 15, 2008—and had been at the Dalton Police station that day, meaning that Bartels had no basis for suggesting that the Piccone children had been in Massachusetts anytime after January 15, 2008.

142. Hence, Bartels's statement that the "the children have not been in the area, or their whereabouts known since 01-17-08" was designed to misleadingly suggest that Mrs. Piccone and the Piccone children were in Massachusetts at the time that the Juvenile Court awarded custody of the children to DCF, when in fact Mrs. Piccone and the Piccone children had already left Massachusetts.

143. Bartels also included other misrepresentations in the application:

   a. Bartels incorrectly stated that a SAIN interview had been scheduled for January 14, 2008 and suggested that Mr. and Mrs. Piccone had somehow acted improperly by not showing up, when in fact there was no SAIN interview scheduled for that date, and Mr. and Mrs. Piccone were never informed that they were supposed to attend any such interview; and

     b.     Bartels incorrectly stated that the Piccones' home was in a state of disarray when it was illegally searched on January 25 and January 27, 2008, when in fact the house was clean and neat; and,

     c.     Bartels incorrectly stated that a New York court had issued a warrant to search the home of Mr. Piccone's sister for Mrs. Piccone and the Piccone children, when in fact, no such warrant was ever issued.

144.    Similarly, Bartels also omitted important information from the application:

     a.     Bartels failed to mention that Mrs. Piccone had never been served with notice of any of the Juvenile Court proceedings; and,

     b.     Bartels failed to include the circumstances of the searches of the Piccones' home on January 25 and January 27, 2008, which would have demonstrated that the searches were illegal.

145.    Finally, Bartels sought to support his application for a criminal complaint and arrest warrant by mentioning the supposed "allegation or [sic] physical abuse/neglect and sexual abuse" involving Mr. Piccone.  Crucially, however, in presenting these allegations, Bartels omitted critical facts, all of which were known to him at the time he submitted the application:

     a.     Bartels failed to mention that Child C had been cleared of abuse after being thoroughly examined by a physician;

     b.     Bartels failed to mention that Nietsche and Vittum had observed Child C on January 11, had not seen any signs of abuse, and had downgraded the status of DCF's investigation from emergency to non-emergency;

    c.      Bartels failed to mention that one of Bartels's own officers had also seen Child C on January 11, and observed that Child C was "clean and had no sign of injuries";

    d.      Bartels failed to mention that there were no allegations of abuse or neglect involving Child A or Child B; and,

    e.      Bartels failed to mention that there were no factual allegations that Mrs. Piccone had abused her children (only a conclusory and entirely unsupported allegation of neglect).

*February 1, 2008 - March 31, 2008*

The Third Illegal Search: The Dalton Police Conduct a Warrantless Search of Bags Taken from the Piccones' Home

146.    On February 1, 2008, the Piccones' next-door neighbor called the Dalton Police to report that there were several cars in the Piccones' driveway.

147.    Defendant Bartels and another Dalton Police officer then went to the Piccones' home.

148.    While there, Bartels and the officer seized several black plastic bags.

149.    As the bags were being loaded into a Dalton Police cruiser, Colleen Piccone (Mr. Piccone's sister) and her boyfriend, who are both high-level officials with the federal Department of Homeland Security, arrived at the Piccones' home.  They told Bartels and the officer that they did not have permission to be on the Piccones' property, let alone to seize anything.

150.    Bartels and the officer ignored Ms. Piccone and her boyfriend, ultimately seizing three to seven black plastic bags of evidence from the Piccones' home.

151.    Bartels and the officer did not have a warrant, nor did they have probable cause to support a warrant if they had sought one.

152.    There were no exigent circumstances that would justify the actions of Bartels and the officer.

153.    Bartels and the officer (or other Dalton Police officers) later searched the bags at the Dalton Police Station.

154.    Incredibly, after searching the bags, Bartels and the Dalton Police claimed to have disposed of the bags and their contents without even taking an inventory of what was in the bags. Upon information and belief, several documents were obtained from the bags and used by Dalton Police as evidentiary support for future legal proceedings.

DCF Completes its 10-Day Investigation in 27 Days and Concludes that the Original Allegations Against Mr. Piccone are Unsupported

155.    On February 6, 2008, DCF concluded its investigation regarding Mr. and Mrs. Piccone.

156.    DCF—specifically Defendants Nietsche and Rice—concluded that there was insufficient evidence to make a finding of abuse or neglect based upon any of the original allegations of abuse or neglect involving Mr. Piccone and Child C.

157.    In their written report, Nietsche and Rice concluded that allegations of neglect against Mr. and Mrs. Piccone were "supported" based on the Piccones' supposed failure to make the children available to DCF for an interview.

158.    Nietsche and Rice made this finding despite Mr. and Mrs. Piccone's well-documented willingness to permit the Piccone children to be interviewed provided that the interviews were videorecorded.

26

159.    Following the conclusion of DCF's investigation, DCF Defendants LaPointe, Rice, Woods, and Nietsche all failed to bring to the Juvenile Court's attention the results of DCF's investigation, including most significantly, the fact that the original allegations of abuse or neglect were unsupported, and that therefore, there was no factual or legal basis for the care and protection proceeding.

160.    LaPointe, Rice, Woods, and Nietsche also refused to present the written conclusions of their investigation to Mr. and Mrs. Piccone for a period of months afterwards, in defiance of  Mr. Piccone's repeated discovery requests and several Juvenile Court orders.  These discovery abuses denied Mr. and Mrs. Piccone the opportunity to notify the Juvenile Court that there was no basis for DCF's continued legal custody of the Piccone children.


Mr. Piccone is Arrested and Held on the Invalid Parental-Kidnapping Charges

161.    On February 12, 2008, Mr. Piccone arrived at Logan International Airport from Paris, France.

162.    By this time, Mr. Piccone was aware of the parental-kidnapping charges pending against him, had retained counsel, and was coming to Boston to defend himself against the charges.

163.    Mr. Piccone was taken into custody and held by federal Immigration and Customs Enforcement ("ICE") agents, who contacted Defendant Bartels, Chief of the Dalton Police.

164.    Upon information and belief, in his conversation with ICE, Defendant Bartels characterized the investigation as one of "horrible" child abuse (rather than the baseless parental-kidnapping charges Mr. Piccone actually faced).

165.    On February 15, 2008, Mr. Piccone was transported to the Berkshire County Jail and House of Correction ("BCJHOC") by two law enforcement officers who had heard of

Defendant Bartels's description of the case. These officers opened the top window on the van so that Mr. Piccone was forced to endure a two-hour ride in below-freezing temperature.

166.    Like every prisoner at BCJHOC, Mr. Piccone spent his first night at the facility on a suicide watch in solitary confinement with the lights on for twenty-four hours. The next day, when Mr. Piccone was supposed to be released into the general prisoner population, a front-page article appeared in the local newspaper, the Berkshire Eagle, raising the allegation that Mr. Piccone had sexually abused his youngest child.

167.    As a result of this publicity, several correctional officers advised Mr. Piccone not to go into the general population, and as a result, Mr. Piccone was forced to endure approximately 30 days in solitary confinement before being released on bail with a GPS ankle bracelet.

168.    During his stay in solitary confinement at BCJHOC, Mr. Piccone was strip searched numerous times—once upon originally entering the faculty, once each time he left the facility for a hearing in either Juvenile Court or District Court, and again when he was ultimately released. In all, Mr. Piccone was strip searched approximately 20 times.


The Fourth Illegal Search: The Massachusetts State Police and Dalton Police Search
Mr. Piccone's Luggage by Making Material Misrepresentations and Omissions in their
Warrant Application

169.    On February 29, 2008, Defendant Richard Smith, a Massachusetts State Police detective, traveled to Boston to take custody of a piece of luggage that Mr. Piccone had brought with him when he arrived at Logan International Airport on February 12.

170.    The previous day, Assistant District Attorney Joan McMenemy called Mr. Piccone's then-attorneys and requested consent to search Mr. Piccone's luggage. Her request was denied.

171.    On or about March 13, 2008—nearly two weeks after Smith seized Mr. Piccone's luggage—Defendant Bartels applied for and received a search warrant and then searched Mr. Piccone's luggage.

172.    In his affidavit in support of the warrant, Bartels failed to include the purported basis for DCF's finding of neglect and the order awarding custody to DCF—namely, that Mr. and Mrs. Piccone had not brought their children to a SAIN interview.  Bartels also failed to mention that Mr. and Mrs. Piccone had offered to have their children interviewed on the condition that the interviews be videorecorded.

173.    Bartels also misrepresented the evidence regarding the allegations of abuse involving Mr. Piccone and Child C, stating that DCF had found the allegations to be unsupported "due to the children not being made available for an interview."  Bartels failed to mention that, in fact, there was no evidence of abuse, and also omitted the following facts, all of which were known to him:

    a.    Bartels failed to mention that Child C had been cleared of abuse after being thoroughly examined by a physician;

    b.    Bartels failed to mention that Nietsche and Vittum had observed Child C on January 11, had not seen any signs of abuse, and had downgraded the status of DCF's investigation from emergency to non-emergency; and,

    c.    Bartels failed to mention that one of Bartels's own officers had also seen Child C on January 11, and observed that Child C was "clean and had no sign of injuries".

174.    Finally, Bartels also omitted or misrepresented many of the same facts as in his application for a criminal complaint, all of which were known to him at the time he applied for the search warrant:

    a.    Bartels failed to mention that Mrs. Piccone had never been served with notice of any of the Juvenile Court proceedings;

    b.    Bartels failed to mention that the Piccone children were lawfully outside the jurisdiction of the Massachusetts courts at the time custody was awarded to DCF;

    c.    Bartels failed to include the circumstances of the searches of the Piccones' home on January 25 and January 27, 2008, which would have demonstrated that the searches were illegal.

    d.    Bartels incorrectly stated that the Piccones' home was in a state of disarray when it was illegally searched on January 25 and January 27, 2008, when in fact the house was clean and neat; and,

    e.    Bartels stated that after "New York officials were initially denied entry" into the New York home of Mr. Piccone's sister, they did eventually "check the home and did not locate any members of the Dalton Piccone family," but he failed to mention that the "check" of the home was actually an illegal warrantless search conducted over the objection of Mr. Piccone's sister.

175.    The search of Mr. Piccone's luggage revealed no evidence relevant to either the criminal charges against Mr. Piccone or the DCF allegations.

176. But the search did reveal approximately 500 pages of Mr. Piccone's legal documents, including: (a) confidential trade secret information regarding several of Mr. Piccone's intellectual property clients; (b) attorney-client and work-product privileged information about the ongoing juvenile and criminal cases against Mr. Piccone; and, (c) attorney-client and work-product privileged information about the ongoing juvenile and criminal cases against Mrs. Piccone.

177. Bartels and Marley knew that Mr. Piccone was an attorney, and given the types of materials that Bartels intended to search for—"printed electronic mail (email), correspondence, . . . personal letters or notes"—Bartels knew or should have known that the search would likely reveal privileged documents, yet he did not include this information in his warrant affidavit, nor did he take any measures to shield himself (or other officers involved in the investigation) from reviewing these privileged documents before beginning the search.

178. Once Bartels and Marley commenced the search, the nature of the underlying documents—including retainer agreements, client e-mails, draft complaints, notes regarding experts, witnesses, and litigation strategies—made their privileged status immediately apparent.

179. Even after seeing that Mr. Piccone's luggage contained numerous privileged documents, Bartels, Marley, and other officers acting at their direction continued to review these materials anyway.


The Fifth Illegal Search: The Dalton Police Seize and Review Mr. Piccone's Passport by Making Material Misrepresentations and Omissions in its Warrant Application

180. Upon being placed into custody in Berkshire County, Mr. Piccone's passport was confiscated and placed in the custody of the Chief of Probation.

181.    The Dalton Police wanted to view Plaintiff's passport, so the police asked the Clerk of Court to provide the passport to them.  The Clerk of Court refused because the police did not have a warrant.

182.    On March 28, 2008, Defendant Bartels applied for a warrant to seize and review Mr. Piccone's passport.  His supporting affidavit is identical to the one he submitted in support of his application to search Mr. Piccone's luggage, and contains all the same deficiencies described in Paragraphs 172-174, which are incorporated by reference herein.


The Sixth and Seventh Illegal Searches: The Dalton Police Search Mr. and Mrs. Piccone's E-mail by Making Material Misrepresentations and Omissions in its Warrant Application.

183.    On or about March 31, 2008, a Virginia police officer—acting at the request of Bartels—applied for a search warrant in Virginia to obtain from America Online "[s]ubscriber and account information and history, payment history, detailed billing, 'Buddy Lists' profiles, address books, IP connection log data, any ANI information, all stored photos and/or files and/or data and/or information, all World-Wide Web profiles and/or homepages, any read and/or unread and/or sent and/or deleted e-mail and any files attached to email, and any other information maintained by or within the databases of America Online and/or 'A.I.M.' and any accounts associated with the real name of person(s) unknown, and /or the screen name of, but not limited to, 'LPICCONE.'"

184.    The Virginia police officer's warrant application incorporated and relied on an affidavit from Bartels.  Bartels's affidavit is nearly identical to the one he submitted in support of his application to search Mr. Piccone's luggage, and contains all the same deficiencies described in Paragraphs 172-174, which are incorporated by reference herein.

185.    Based on Bartels's deficient affidavit, a Virginia court issued a warrant for the materials requested, and as a result, a large volume of Mr. Piccone's personal and legal e-mail was produced to the Dalton Police.

186.    On or about April 15, 2008, a California police officer—acting at the request of Bartels—applied for a search warrant in California to obtain from Yahoo!, Inc. "[a]ny and all information for Yahoo! ID 'elpiccone@yahoo.com,' to include all subscriber information, such as name and address, date of birth, gender, date account created, account status, Yahoo! e-mail address, alternate e-mail address, registration from IP, date ID registered, and log-in IP addresses associated with session time and dates, Metadata information associated with the file uploads to include IP addresses, dates and times," and "[a]ny and all digital images related to 'elpiccone@yahoo.com' including but not limited to images located in the accounts photo album including Flickr photos, briefcase, and 360 areas and sent and received e-mails."

187.    The California police officer's warrant application incorporated and relied on an affidavit from Bartels.  Bartels's affidavit is nearly identical to the one he submitted in support of his application to search Mr. Piccone's luggage, and contains all the same deficiencies described in Paragraphs 172-174, which are incorporated by reference herein.

188.    Based on Bartels's deficient affidavit, a California court issued a warrant for the materials requested, and as a result, a large volume of Mrs. Piccone's personal and legal e-mail was produced to the Dalton Police.

189.    At the time Bartels submitted the warrant affidavits, he knew that Mr. Piccone was an attorney, and given that Bartels was seeking to search Mr. and Mrs. Piccone's e-mail, he knew or should have known that the search would likely reveal privileged documents, yet he did not include this information in his warrant affidavit, nor did he take any measures to shield

himself (or other officers involved in the investigation) from reviewing these privileged documents before beginning the search.

190.    Once Bartels (or other officers acting at his direction) commenced the search, the nature of the underlying documents—including retainer agreements, client e-mails, draft complaints, notes regarding experts, witnesses, and litigation strategies—made their privileged status immediately apparent.

191.    Even after seeing that Mr. and Mrs. Piccone's e-mails contained numerous privileged documents, Bartels (or other officers acting at his direction) continued to review these materials anyway.

192.    More troubling still, Bartels and Marley made Mr. And Mrs. Piccone's personal and legal e-mail available to every member of the Dalton Police, including officers who had no involvement in the Piccones' case.

\*       \*       \*

193.    As result of the actions described above, Mr. Piccone has incurred substantial damages and has suffered mental anguish, emotional distress, embarrassment, and damage to his reputation.

194.    As result of the actions described above, Mrs. Piccone has incurred substantial damages and has suffered mental anguish, emotional distress, embarrassment, and damage to her reputation.

## COUNT I
### Plaintiffs Mr. and Mrs. Piccone Against Defendant Bartels
### (42 U.S.C. § 1983 — Fourth Amendment to the U.S. Constitution)

195.    Plaintiffs re-allege and incorporate herein Paragraphs 1 through 194.

196.    At all relevant times, Mr. and Mrs. Piccone had a reasonable expectation of privacy in their home in Dalton, Massachusetts.

197.    On January 25, 2008, Defendant Bartels violated Mr. and Mrs. Piccone's clearly established Fourth Amendment rights by conducting a warrantless search of the Piccones' home without consent and in the absence of exigent circumstances.

198.    As a direct and proximate result of Bartels's actions, Mr. and Mrs. Piccone have suffered mental anguish, emotional distress, embarrassment, and damage to their reputations.

199.    Bartels's actions were motivated by an evil motive or intent or involved reckless or callous indifference to Mr. and Mrs. Piccone's Fourth Amendment right to be free from unreasonable searches.


## COUNT II
### Plaintiffs Mr. and Mrs. Piccone Against Defendant Bartels
### (Mass. Gen. Laws ch. 12, § 11I — Article 14 of the Massachusetts Declaration of Rights)

200.    Plaintiffs re-allege and incorporate herein Paragraphs 1 through 199.

201.    At all relevant times, Mr. and Mrs. Piccone had a reasonable expectation of privacy in their home in Dalton, Massachusetts.

202.    On January 25, 2008, Defendant Bartels violated Mr. and Mrs. Piccone's clearly established Article 14 rights by conducting a warrantless search of the Piccones' home without consent and in the absence of exigent circumstances.

203.    As a direct and proximate result of Bartels's actions, Mr. and Mrs. Piccone have suffered mental anguish, emotional distress, embarrassment, and damage to their reputations.

204.    Bartels's actions were motivated by an evil motive or intent or involved reckless or callous indifference to Mr. and Mrs. Piccone's Article 14 right to be free from unreasonable searches.

## COUNT III
### Plaintiffs Mr. and Mrs. Piccone Against Defendant Marley
### (42 U.S.C. § 1983 — Fourth Amendment to the U.S. Constitution)

205.    Plaintiffs re-allege and incorporate herein Paragraphs 1 through 204.

206.    At all relevant times, Mr. and Mrs. Piccone had a reasonable expectation of privacy in their home in Dalton, Massachusetts.

207.    On January 27, 2008, Defendant Marley violated Mr. and Mrs. Piccone's clearly established Fourth Amendment rights by conducting a warrantless search of the Piccones' home without consent and in the absence of exigent circumstances.

208.    As a direct and proximate result of Marley's actions, Mr. and Mrs. Piccone have suffered mental anguish, emotional distress, embarrassment, and damage to their reputations.

209.    Marley's actions were motivated by an evil motive or intent or involved reckless or callous indifference to Mr. and Mrs. Piccone's Fourth Amendment right to be free from unreasonable searches.

## COUNT IV
### Plaintiffs Mr. and Mrs. Piccone Against Defendant Marley
### (Mass. Gen. Laws ch. 12, § 11I — Article 14 of the Massachusetts Declaration of Rights)

210.    Plaintiffs re-allege and incorporate herein Paragraphs 1 through 209.

211.    At all relevant times, Mr. and Mrs. Piccone had a reasonable expectation of privacy in their home in Dalton, Massachusetts.

212.    On January 27, 2008, Defendant Marley violated Mr. and Mrs. Piccone's clearly established Article 14 rights by conducting a warrantless search of the Piccones' home without consent and in the absence of exigent circumstances.

213.    As a direct and proximate result of Marley's actions, Mr. and Mrs. Piccone have suffered mental anguish, emotional distress, embarrassment, and damage to their reputations.

214.    Marley's actions were motivated by an evil motive or intent or involved reckless or callous indifference to Mr. and Mrs. Piccone's Article 14 right to be free from unreasonable searches.

### COUNT V
### Plaintiffs Mr. and Mrs. Piccone Against Defendant Bartels
### (42 U.S.C. § 1983 — Fourth Amendment to the U.S. Constitution)

215.    Plaintiffs re-allege and incorporate herein Paragraphs 1 through 214.

216.    At all relevant times, Mr. and Mrs. Piccone had a reasonable expectation of privacy in property located at their home in Dalton, Massachusetts.

217.    On February 1, 2008, Defendant Bartels violated Mr. and Mrs. Piccone's clearly established Fourth Amendment rights by conducting a warrantless search and seizure of three to seven black plastic bags without consent and in the absence of exigent circumstances.

218.    As a direct and proximate result of Bartels's actions, Mr. and Mrs. Piccone have suffered mental anguish, emotional distress, embarrassment, and damage to their reputations.

219.    Bartels's actions were motivated by an evil motive or intent or involved reckless or callous indifference to Mr. and Mrs. Piccone's Fourth Amendment right to be free from unreasonable searches and seizures.

**COUNT VI**
**Plaintiffs Mr. and Mrs. Piccone Against Defendant Bartels**
**(Mass. Gen. Laws ch. 12, § 11I — Article 14 of the Massachusetts Declaration of Rights)**

220.    Plaintiffs re-allege and incorporate herein Paragraphs 1 through 219.

221.    At all relevant times, Mr. and Mrs. Piccone had a reasonable expectation of privacy in property located at their home in Dalton, Massachusetts.

222.    On February 1, 2008, Defendant Bartels violated Mr. and Mrs. Piccone's clearly established Article 14 rights by conducting a warrantless search and seizure of three to seven black plastic bags without consent and in the absence of exigent circumstances.

223.    As a direct and proximate result of Bartels's actions, Mr. and Mrs. Piccone have suffered mental anguish, emotional distress, embarrassment, and damage to their reputations.

224.    Bartels's actions were motivated by an evil motive or intent or involved reckless or callous indifference to Mr. and Mrs. Piccone's Article 14 right to be free from unreasonable searches and seizures.

**COUNT VII**
**Plaintiff Mr. Piccone Against Defendant Smith**
**(42 U.S.C. § 1983 — Fourth Amendment to the U.S. Constitution)**

225.    Plaintiffs re-allege and incorporate herein Paragraphs 1 through 224.

226.    At all relevant times, Mr. Piccone had a reasonable expectation of privacy in luggage he brought with him into the United States on February 12, 2008.

227.    On February 29, 2008, Defendant Smith violated Mr. Piccone's clearly established Fourth Amendment rights by conducting a warrantless seizure of Mr. Piccone's luggage without consent and in the absence of exigent circumstances.

228.    As a direct and proximate result of Smith's actions, Mr. Piccone has suffered mental anguish, emotional distress, embarrassment, and damage to his reputation.

229.    Smith's actions were motivated by an evil motive or intent or involved reckless or callous indifference to Mr. Piccone's Fourth Amendment right to be free from unreasonable seizures.

## COUNT VIII
### Plaintiffs Mr. Piccone Against Defendant Smith
### (Mass. Gen. Laws ch. 12, § 11I — Article 14 of the Massachusetts Declaration of Rights)

230.    Plaintiffs re-allege and incorporate herein Paragraphs 1 through 229.

231.    At all relevant times, Mr. Piccone had a reasonable expectation of privacy in luggage he brought with him into the United States on February 12, 2008.

232.    On February 29, 2008, Defendant Smith violated Mr. Piccone's clearly established Article 14 rights by conducting a warrantless seizure of Mr. Piccone's luggage without consent and in the absence of exigent circumstances.

233.    As a direct and proximate result of Smith's actions, Mr. Piccone has suffered mental anguish, emotional distress, embarrassment, and damage to his reputation.

234.    Smith's actions were motivated by an evil motive or intent or involved reckless or callous indifference to Mr. Piccone's Article 14 right to be free from unreasonable seizures.

## COUNT IX
### Plaintiff Mr. Piccone Against Defendant Bartels
### (42 U.S.C. § 1983 — Fourth Amendment to the U.S. Constitution)

235.    Plaintiffs re-allege and incorporate herein Paragraphs 1 through 234.

236.    At all relevant times, Mr. Piccone had a reasonable expectation of privacy in luggage he brought with him into the United States on February 12, 2008.

237.     On or about March 13, 2008, Defendant Bartels violated Mr. Piccone's clearly established Fourth Amendment rights by applying for a search warrant with a supporting affidavit that misrepresented and/or omitted critical facts.

238.     Without the deficiencies in Bartels's affidavit, there would not have been probable cause for a warrant to issue.

239.     On or about March 13-15, 2008, Defendant Bartels violated Mr. Piccone's clearly established Fourth Amendment rights by reviewing Mr. Piccone's privileged documents, including confidential trade secret information regarding several of Mr. Piccone's intellectual property clients, and attorney-client and work-product privileged information about the ongoing juvenile and criminal cases against Mr. and Mrs. Piccone.

240.     As a direct and proximate result of Bartels's actions, Mr. and Mrs. Piccone have suffered mental anguish, emotional distress, embarrassment, and damage to their reputations.

241.     Bartels's actions were motivated by an evil motive or intent or involved reckless or callous indifference to Mr. Piccone's Fourth Amendment right to be free from unreasonable searches and seizures.

**COUNT X**
**Plaintiffs Mr. Piccone Against Defendant Bartels**
**(Mass. Gen. Laws ch. 12, § 11I — Article 14 of the Massachusetts Declaration of Rights)**

242.     Plaintiffs re-allege and incorporate herein Paragraphs 1 through 241.

243.     At all relevant times, Mr. Piccone had a reasonable expectation of privacy in luggage he brought with him into the United States on February 12, 2008.

244.     On or about March 13, 2008, Defendant Bartels violated Mr. Piccone's clearly established Article 14 rights by applying for a search warrant with a supporting affidavit that misrepresented and/or omitted critical facts.

245.    Without the deficiencies in Bartels's affidavit, there would not have been probable cause for a warrant to issue.

246.    On or about March 13-15, 2008, Defendant Bartels violated Mr. Piccone's clearly established Article 14 rights by reviewing Mr. Piccone's privileged documents, including confidential trade secret information regarding several of Mr. Piccone's intellectual property clients, and attorney-client and work-product privileged information about the ongoing juvenile and criminal cases against Mr. and Mrs. Piccone.

247.    As a direct and proximate result of Bartels's actions, Mr. and Mrs. Piccone have suffered mental anguish, emotional distress, embarrassment, and damage to their reputations.

248.    Bartels's actions were motivated by an evil motive or intent or involved reckless or callous indifference to Mr. Piccone's Article 14 right to be free from unreasonable searches and seizures.


## COUNT XI
### Plaintiff Mr. Piccone Against Defendant Bartels
### (42 U.S.C. § 1983 — Fourth Amendment to the U.S. Constitution)

249.    Plaintiffs re-allege and incorporate herein Paragraphs 1 through 248.

250.    At all relevant times, Mr. Piccone had a reasonable expectation of privacy in the passport he brought with him when he returned to the United States on February 12, 2008.

251.    On or about March 28, 2008, Defendant Bartels violated Mr. Piccone's clearly established Fourth Amendment rights by applying for a search warrant with a supporting affidavit that misrepresented and/or omitted critical facts.

252.    Without the deficiencies in Bartels's affidavit, there would not have been probable cause for a warrant to issue.

253.    As a direct and proximate result of Bartels's actions, Mr. Piccone has suffered mental anguish, emotional distress, embarrassment, and damage to his reputation.

254.    Bartels's actions were motivated by an evil motive or intent or involved reckless or callous indifference to Mr. Piccone's Fourth Amendment right to be free from unreasonable searches and seizures.

### COUNT XII
**Plaintiffs Mr. Piccone Against Defendant Bartels**
**(Mass. Gen. Laws ch. 12, § 11I — Article 14 of the Massachusetts Declaration of Rights)**

255.    Plaintiffs re-allege and incorporate herein Paragraphs 1 through 254.

256.    At all relevant times, Mr. Piccone had a reasonable expectation of privacy in the passport he brought with him when he returned to the United States on February 12, 2008.

257.    On or about March 28, 2008, Defendant Bartels violated Mr. Piccone's clearly established Article 14 rights by applying for a search warrant with a supporting affidavit that misrepresented and/or omitted critical facts.

258.    Without the deficiencies in Bartels's affidavit, there would not have been probable cause for a warrant to issue.

259.    As a direct and proximate result of Bartels's actions, Mr. Piccone has suffered mental anguish, emotional distress, embarrassment, and damage to his reputation.

260.    Bartels's actions were motivated by an evil motive or intent or involved reckless or callous indifference to Mr. Piccone's Article 14 right to be free from unreasonable searches and seizures.

## COUNT XIII
### Plaintiff Mr. Piccone Against Defendant Bartels
### (42 U.S.C. § 1983 — Fourth Amendment to the U.S. Constitution)

261.    Plaintiffs re-allege and incorporate herein Paragraphs 1 through 260.

262.    At all relevant times, Mr. Piccone had a reasonable expectation of privacy in his electronic mail sent and received over America Online.

263.    On or about March 31, 2008, Defendant Bartels violated Mr. Piccone's clearly established Fourth Amendment rights by helping apply for a Virginia search warrant with a supporting affidavit that misrepresented and/or omitted critical facts.

264.    Without the deficiencies in Bartels's affidavit, there would not have been probable cause for a warrant to issue.

265.    On various dates in or about April and May 2008, Defendant Bartels violated Mr. Piccone's clearly established Fourth Amendment rights by reviewing Mr. Piccone's privileged documents, including confidential trade secret information regarding several of Mr. Piccone's intellectual property clients, and attorney-client and work-product privileged information about the ongoing juvenile and criminal cases against Mr. and Mrs. Piccone.

266.    As a direct and proximate result of Bartels's actions, Mr. Piccone has suffered mental anguish, emotional distress, embarrassment, and damage to his reputation.

267.    Bartels's actions were motivated by an evil motive or intent or involved reckless or callous indifference to Mr. Piccone's Fourth Amendment right to be free from unreasonable searches and seizures.

## COUNT XIV
### Plaintiffs Mr. Piccone Against Defendant Bartels
### (Mass. Gen. Laws ch. 12, § 11I — Article 14 of the Massachusetts Declaration of Rights)

268.    Plaintiffs re-allege and incorporate herein Paragraphs 1 through 267.

269.    At all relevant times, Mr. Piccone had a reasonable expectation of privacy in his electronic mail sent and received over America Online.

270.    On or about March 31, 2008, Defendant Bartels violated Mr. Piccone's clearly established Article 14 rights by helping apply for a Virginia search warrant with a supporting affidavit that misrepresented and/or omitted critical facts.

271.    Without the deficiencies in Bartels's affidavit, there would not have been probable cause for a warrant to issue.

272.    On various dates in or about April and May 2008, Defendant Bartels violated Mr. Piccone's clearly established Article 14 rights by reviewing Mr. Piccone's privileged documents, including confidential trade secret information regarding several of Mr. Piccone's intellectual property clients, and attorney-client and work-product privileged information about the ongoing juvenile and criminal cases against Mr. and Mrs. Piccone.

273.    As a direct and proximate result of Bartels's actions, Mr. Piccone has suffered mental anguish, emotional distress, embarrassment, and damage to his reputation.

274.    Bartels's actions were motivated by an evil motive or intent or involved reckless or callous indifference to Mr. Piccone's Article 14 right to be free from unreasonable searches and seizures.


**COUNT XV**
**Plaintiff Mrs. Piccone Against Defendant Bartels**
**(42 U.S.C. § 1983 — Fourth Amendment to the U.S. Constitution)**

275.    Plaintiffs re-allege and incorporate herein Paragraphs 1 through 274.

276.    At all relevant times, Mrs. Piccone had a reasonable expectation of privacy in her electronic mail sent and received through Yahoo!.

277. On or about March 31, 2008, Defendant Bartels violated Mrs. Piccone's clearly established Fourth Amendment rights by helping apply for a California search warrant with a supporting affidavit that misrepresented and/or omitted critical facts.

278. Without the deficiencies in Bartels's affidavit, there would not have been probable cause for a warrant to issue.

279. On various dates in or about April and May 2008, Defendant Bartels violated Mrs. Piccone's clearly established Fourth Amendment rights by reviewing Mrs. Piccone's privileged documents, including attorney-client privileged information about the ongoing juvenile and criminal cases against Mr. and Mrs. Piccone.

280. As a direct and proximate result of Bartels's actions, Mrs. Piccone has suffered mental anguish, emotional distress, embarrassment, and damage to her reputation.

281. Bartels's actions were motivated by an evil motive or intent or involved reckless or callous indifference to Mrs. Piccone's Fourth Amendment right to be free from unreasonable searches and seizures.

## COUNT XVI
### Plaintiffs Mrs. Piccone Against Defendant Bartels
### (Mass. Gen. Laws ch. 12, § 11I — Article 14 of the Massachusetts Declaration of Rights)

282. Plaintiffs re-allege and incorporate herein Paragraphs 1 through 281.

283. At all relevant times, Mrs. Piccone had a reasonable expectation of privacy in her electronic mail sent and received through Yahoo!.

284. On or about March 31, 2008, Defendant Bartels violated Mrs. Piccone's clearly established Article 14 rights by helping apply for a California search warrant with a supporting affidavit that misrepresented and/or omitted critical facts.

285.    Without the deficiencies in Bartels's affidavit, there would not have been probable cause for a warrant to issue.

286.    On various dates in or about April and May 2008, Defendant Bartels violated Mrs. Piccone's clearly established Article 14 rights by reviewing Mrs. Piccone's privileged documents, including attorney-client privileged information about the ongoing juvenile and criminal cases against Mr. and Mrs. Piccone.

287.    As a direct and proximate result of Bartels's actions, Mrs. Piccone has suffered mental anguish, emotional distress, embarrassment, and damage to her reputation.

288.    Bartels's actions were motivated by an evil motive or intent or involved reckless or callous indifference to Mrs. Piccone's Article 14 right to be free from unreasonable searches and seizures.


### COUNT XVII
**Plaintiffs Mr. and Mrs. Piccone Against Defendant Town of Dalton**
**(42 U.S.C. § 1983 — Municipal Liability for Fourth Amendment Violations Under**
***Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978))**

289.    Plaintiffs re-allege and incorporate herein Paragraphs 1 through 288.

290.    As the Chief of the Dalton Police, Defendant Bartels was the final policymaker for the Town of Dalton with respect to its police department.

291.    As the Chief of the Dalton Police, Defendant Bartels was the final decision-maker regarding the warrantless searches and seizures of Mr. and Mrs. Piccone's home and personal property on January 25, 2008, January 27, 2008, and February 1, 2008.

292.    As the Chief of the Dalton Police, Defendant Bartels was the final decision-maker regarding what information to include and omit from the search warrant affidavits submitted in

support of the warrants for Mr. Piccone's suitcase, Mr. Piccone's passport, Mr. Piccone's

America Online e-mail account, and Mrs. Piccone's Yahoo! e-mail account.

293.    As the Chief of the Dalton Police, Defendant Bartels was the final decision-maker

regarding the review and dissemination of Mr. and Mrs. Piccone's personal and privileged

documents, including personal e-mail, confidential trade secret information regarding several of

Mr. Piccone's intellectual property clients, and attorney-client and work-product privileged

information about the ongoing juvenile and criminal cases against Mr. and Mrs. Piccone.

294.    As a direct and proximate result of Chief Bartels's policymaking decisions on

behalf of the Town of Dalton, Mr. and Mrs. Piccone have suffered mental anguish, emotional

distress, embarrassment, and damage to their reputations.


## COUNT XVIII
### Plaintiffs Mr. and Mrs. Piccone Against Defendant Town of Dalton
### (Mass. Gen. Laws ch. 12, § 11I — Municipal Liability for Article 14 Violations)

295.    Plaintiffs re-allege and incorporate herein Paragraphs 1 through 294.

296.    As the Chief of the Dalton Police, Defendant Bartels was the final policymaker

for the Town of Dalton with respect to its police department.

297.    As the Chief of the Dalton Police, Defendant Bartels was the final decision-maker

regarding the warrantless searches and seizures of Mr. and Mrs. Piccone's home and personal

property on January 25, 2008, January 27, 2008, and February 1, 2008.

298.    As the Chief of the Dalton Police, Defendant Bartels was the final decision-maker

regarding what information to include and omit from the search warrant affidavits submitted in

support of the warrants for Mr. Piccone's suitcase, Mr. Piccone's passport, Mr. Piccone's

America Online e-mail account, and Mrs. Piccone's Yahoo! e-mail account.

299.    As the Chief of the Dalton Police, Defendant Bartels was the final decision-maker regarding the review and dissemination of Mr. and Mrs. Piccone's personal and privileged documents, including personal e-mail, confidential trade secret information regarding several of Mr. Piccone's intellectual property clients, and attorney-client and work-product privileged information about the ongoing juvenile and criminal cases against Mr. and Mrs. Piccone.

300.    As a direct and proximate result of Chief Bartels's policymaking decisions on behalf of the Town of Dalton, Mr. and Mrs. Piccone have suffered mental anguish, emotional distress, embarrassment, and damage to their reputations.

## COUNT XIX
### Plaintiffs Mr. and Mrs. Piccone Against Defendant Bartels
### (Malicious Prosecution)

301.    Plaintiffs re-allege and incorporate herein Paragraphs 1 through 300.

302.    On January 29, 2008, Defendant Bartels instigated criminal proceedings for parental kidnapping against Mr. and Mrs. Piccone.

303.    Defendant Bartels lacked probable cause to believe that Mr. Piccone had committed the crimes charged, and instigated the charges against Mr. Piccone with malice.

304.    Defendant Bartels lacked probable cause to believe that Mrs. Piccone had committed the crimes charged, and instigated the charges against Mrs. Piccone with malice.

305.    The parental-kidnapping charges against both Mr. and Mrs. Piccone have been legally terminated in their favor.

306.    As a direct and proximate result of Defendant Bartels's actions, Mr. and Mrs. Piccone have incurred substantial damages and have suffered mental anguish, emotional distress, embarrassment, and damage to their reputations.

## COUNT XX
## Plaintiff Mr. Piccone Against Defendant Bartels
### (False Arrest)

307.    Plaintiffs re-allege and incorporate herein Paragraphs 1 through 306.

308.    On February 12, 2008, Mr. Piccone was arrested.

309.    Defendant Bartels intentionally caused Mr. Piccone to be wrongfully arrested by misrepresenting and/or omitting critical facts from Bartels's application for an arrest warrant.

310.    As a direct and proximate result of Defendant Bartels's actions, Mr. Piccone has incurred substantial damages and has suffered mental anguish, emotional distress, embarrassment, and damage to his reputation.

## COUNT XXI
## Plaintiff Mr. Piccone Against All DCF Defendants
### (42 U.S.C. § 1983 — Substantive Due Process Under
### the Fourteenth Amendment to the U.S. Constitution)

311.    Plaintiffs re-allege and incorporate herein Paragraphs 1 through 310.

312.    Under the Fourteenth Amendment, Mr. Piccone has a clearly established, constitutionally protected liberty interest in the care, custody, and control of his children.

313.    Each of the DCF Defendants violated Mr. Piccone's clearly established Fourteenth Amendment rights by unjustifiably removing Mr. Piccone's children from his care, custody and control.

314.    As a result of the DCF Defendants' actions, Mr. Piccone incurred substantial damages and has suffered mental anguish, emotional distress, embarrassment, and damage to his reputation.

315.    All of the DCF Defendants' actions were motivated by an evil motive or intent or involved reckless or callous indifference to Mr. Piccone's Fourteenth Amendment rights.

49

## COUNT XXII
### Plaintiff Mr. Piccone Against All DCF Defendants
### (Mass. Gen. Laws ch. 12, § 11I — Substantive Due Process Under
### Articles 1 and 10 of the Massachusetts Declaration of Rights)

316.    Plaintiffs re-allege and incorporate herein Paragraphs 1 through 315.

317.    Under Articles 1 and 10 of the Massachusetts Declaration of Rights, Mr. Piccone

has a clearly established, constitutionally protected liberty interest in the care, custody, and

control of his children.

318.    Each of the DCF Defendants violated Mr. Piccone's clearly established Article 1

and 10 rights by unjustifiably removing Mr. Piccone's children from his care, custody and

control.

319.    As a result of the DCF Defendants' actions, Mr. Piccone incurred substantial

damages and has suffered mental anguish, emotional distress, embarrassment, and damage to his

reputation.

320.    All of the DCF Defendants' actions were motivated by an evil motive or intent or

involved reckless or callous indifference to Mr. Piccone's Article 1 and 10 rights.


## COUNT XXIII
### Plaintiff Mrs. Piccone Against All DCF Defendants
### (42 U.S.C. § 1983 — Substantive Due Process Under
### the Fourteenth Amendment to the U.S. Constitution)

321.    Plaintiffs re-allege and incorporate herein Paragraphs 1 through 320.

322.    Under the Fourteenth Amendment, Mrs. Piccone has a clearly established,

constitutionally protected liberty interest in the care, custody, and control of her children.

323.    Each of the DCF Defendants violated Mrs. Piccone's clearly established Fourteenth Amendment rights by unjustifiably removing Mrs. Piccone's children from her care, custody and control.

324.    As a result of the DCF Defendants' actions, Mrs. Piccone incurred substantial damages and has suffered mental anguish, emotional distress, embarrassment, and damage to her reputation.

325.    All of the DCF Defendants' actions were motivated by an evil motive or intent or involved reckless or callous indifference to Mrs. Piccone's Fourteenth Amendment rights.


## COUNT XXIV
### Plaintiff Mrs. Piccone Against All DCF Defendants
### (Mass. Gen. Laws ch. 12, § 11I — Substantive Due Process Under
### Articles 1 and 10 of the Massachusetts Declaration of Rights)

326.    Plaintiffs re-allege and incorporate herein Paragraphs 1 through 325.

327.    Under Articles 1 and 10 of the Massachusetts Declaration of Rights, Mrs. Piccone has a clearly established, constitutionally protected liberty interest in the care, custody, and control of her children.

328.    Each of the DCF Defendants violated Mrs. Piccone's clearly established Article 1 and 10 rights by unjustifiably removing Mrs. Piccone's children from her care, custody and control.

329.    As a result of the DCF Defendants' actions, Mrs. Piccone incurred substantial damages and has suffered mental anguish, emotional distress, embarrassment, and damage to her reputation.

330.    All of the DCF Defendants' actions were motivated by an evil motive or intent or involved reckless or callous indifference to Mrs. Piccone's Article 1 and 10 rights.

## COUNT XXV
### Plaintiff Mr. Piccone Against All DCF Defendants
### (42 U.S.C. § 1983 — Procedural Due Process Under
### the Fourteenth Amendment to the U.S. Constitution)

331.    Plaintiffs re-allege and incorporate herein Paragraphs 1 through 330.

332.    Under the Fourteenth Amendment, Mr. Piccone has a clearly established,

constitutionally protected liberty interest in the care, custody, and control of his children.

333.    Each of the DCF Defendants violated Mr. Piccone's clearly established

Fourteenth Amendment rights by unjustifiably seeking custody of Mr. Piccone's children in an

*ex parte* proceeding and submitting a custody petition that misrepresented and omitted material

facts.

334.    As a result of the DCF Defendants' actions, Mr. Piccone incurred substantial

damages and has suffered mental anguish, emotional distress, embarrassment, and damage to his

reputation.

335.    All of the DCF Defendants' actions were motivated by an evil motive or intent or

involved reckless or callous indifference to Mr. Piccone's Fourteenth Amendment rights.

## COUNT XXVI
### Plaintiff Mr. Piccone Against All DCF Defendants
### (Mass. Gen. Laws ch. 12, § 11I — Procedural Due Process Under
### Article 12 of the Massachusetts Declaration of Rights)

336.    Plaintiffs re-allege and incorporate herein Paragraphs 1 through 335.

337.    Under the Massachusetts Declaration of Rights, Mr. Piccone has a clearly

established, constitutionally protected liberty interest in the care, custody, and control of his

children.

338.    Each of the DCF Defendants violated Mr. Piccone's clearly established rights under Article 12 of the Massachusetts Declaration of Rights by unjustifiably seeking custody of Mr. Piccone's children in an *ex parte* proceeding and submitting a custody petition that misrepresented and omitted material facts.

339.    As a result of the DCF Defendants' actions, Mr. Piccone incurred substantial damages and has suffered mental anguish, emotional distress, embarrassment, and damage to his reputation.

340.    All of the DCF Defendants' actions were motivated by an evil motive or intent or involved reckless or callous indifference to Mr. Piccone's Article 12 rights.

### COUNT XXVII
### Plaintiff Mrs. Piccone Against All DCF Defendants
### (42 U.S.C. § 1983 — Procedural Due Process Under
### the Fourteenth Amendment to the U.S. Constitution)

341.    Plaintiffs re-allege and incorporate herein Paragraphs 1 through 340.

342.    Under the Fourteenth Amendment, Mrs. Piccone has a clearly established, constitutionally protected liberty interest in the care, custody, and control of her children.

343.    Each of the DCF Defendants violated Mrs. Piccone's clearly established Fourteenth Amendment rights by unjustifiably seeking custody of Mrs. Piccone's children in an *ex parte* proceeding and submitting a custody petition that misrepresented and omitted material facts.

344.    As a result of the DCF Defendants' actions, Mrs. Piccone incurred substantial damages and has suffered mental anguish, emotional distress, embarrassment, and damage to her reputation.

345.    All of the DCF Defendants' actions were motivated by an evil motive or intent or involved reckless or callous indifference to Mrs. Piccone's Fourteenth Amendment rights.

## COUNT XXVIII
### Plaintiff Mrs. Piccone Against All DCF Defendants
### (Mass. Gen. Laws ch. 12, § 11I — Procedural Due Process Under Article 12 of the Massachusetts Declaration of Rights)

346.    Plaintiffs re-allege and incorporate herein Paragraphs 1 through 345.

347.    Under the Massachusetts Declaration of Rights, Mrs. Piccone has a clearly established, constitutionally protected liberty interest in the care, custody, and control of her children.

348.    Each of the DCF Defendants violated Mrs. Piccone's clearly established rights under Article 12 of the Massachusetts Declaration of Rights by unjustifiably seeking custody of Mrs. Piccone's children in an *ex parte* proceeding and submitting a custody petition that misrepresented and omitted material facts.

349.    As a result of the DCF Defendants' actions, Mrs. Piccone incurred substantial damages and has suffered mental anguish, emotional distress, embarrassment, and damage to his reputation.

350.    All of the DCF Defendants' actions were motivated by an evil motive or intent or involved reckless or callous indifference to Mrs. Piccone's Article 12 rights.

## COUNT XXIX
### Plaintiffs Mr. and Mrs. Piccone Against All DCF Defendants
### (Abuse of Process)

351.    Plaintiffs re-allege and incorporate herein Paragraphs 1 through 350.

352.    The DCF Defendants instituted legal process against Mr. and Mrs. Piccone by filing the Petition.

353.    The DCF Defendants filed the Petition with malice and for an unlawful purpose.

354.    As a result of the DCF Defendants' actions, Mr. and Mrs. Piccone incurred substantial damages and have suffered mental anguish, emotional distress, embarrassment, and damage to their reputations.


### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs Louis and Elena Piccone respectfully requests that the Court:

A.    Enter judgment against Defendants on all counts of the Complaint;

B.    Compensate Plaintiffs damages, including but not limited to damages for:

    1.    Plaintiffs' past and continuing mental anguish, emotional distress, embarrassment, and damage to their reputations;

    2.    Plaintiffs' past and future economic loss;

    3.    Plaintiffs' legal and other expenses resulting from the care and protection and criminal proceedings;

C.    Award Plaintiffs punitive damages;

D.    Order Defendants to pay Plaintiffs' costs and attorneys' fees in this lawsuit;

E.    Enter an injunction ordering Defendant McClain to cause DCF to expunge (*i.e.,* permanently remove) all DCF records relating to Plaintiffs and their children;

F.    Enter an injunction ordering all Defendants to effect the removal of Plaintiffs' names from any and all federal, state, and/or international databases arising from the charges of abuse, neglect, and kidnapping;

G.    Declare that:

    1.    the Massachusetts Juvenile Court's January 16, 2008 order awarding custody of the Plaintiffs' children to DCF was unlawful, should not have been entered, and would not have been entered but for Defendants' unlawful actions;

    2.    the Massachusetts Juvenile Court's order directing Mr. Piccone to go to New York to bring the Plaintiffs' children back to Massachusetts was both unlawful and factually impossible; and

    3.    DCF acted unlawfully by seeking to remove the Plaintiffs' children in an *ex parte* proceeding, and any similar action in the future would also be unlawful; and,

H.    Grant Plaintiffs all other relief that the Court deems just.


## JURY DEMAND

Plaintiffs request a jury trial on all counts.

Respectfully submitted,

LOUIS PICCONE and ELENA PICCONE,

By their attorneys,


/s/ John G. Swomley
John G. Swomley (BBO # 551450)
Scott A. Katz (BBO # 655681)
SWOMLEY & ASSOCIATES
227 Lewis Wharf
Boston, MA 02110
617.227.9443

Dated: August 25, 2009