UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LOUIS PICCONE and ELENA PICCONE, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civ. No. 09-30146-MAP |
| ) | |
| ANGELO MCCLAIN, LYNNE REBER, ) | |
| JOAN MAZZEO, HEATHER NIETSCHE, ) | |
| IRENE WOODS, LANCE LAPOINTE ) | |
| JANET RICE, ) | |
| ) | |
| JOHN W. BARTELS, JR., JOHN M. MARLEY, ) | |
| TOWN OF DALTON, and ) | |
| ) | |
| RICHARD SMITH, ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFFS' OPPOSITON TO DEFENDANTS, ANGELO MCCLAIN, LYNNE REBER, JOAN MAZZEO, HEATHER NIETSCHE, IRENE WOODS, LANCE LAPOINTE, AND JANET RICE'S MOTIONS TO DISMISS**

**PROCEDURAL BACKGROUND**

Plaintiffs sued defendants Lynne Reber, Joan Mazzeo, Heather Nietsche, Irene Woods, Lance LaPointe, and Janet Rice, in their individual capacities, for their roles in the incidents detailed in the complaint. Plaintiffs sued Angelo McClain solely in his official capacity, as the Commissioner of the Department of Children and Families ("DCF"), for injunctive relief. The individual defendants and the Commissioner, Angelo McClain, now move to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6). For the following reasons, the motion should be denied in its entirety.

**STANDARD OF REVIEW**

The rules of pleading require "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  To survive a motion to dismiss, the complaint must merely allege "a plausible entitlement to relief."  *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Twombly*, 550 U.S. at 559).  Importantly, "[s]pecific facts are not necessary" for a claim to be "plausible"; instead, the "short and plain statement" required by Rule 8(a) need only "give the defendant notice of what the . . . claim and the grounds upon which it rests."  *Gargano v. Liberty Int'l Underwriters*, 572 F.3d 45, 48 (1st Cir. 2009) (quoting *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 555 (2007).  Put another way, a claim is "plausible" when the complaint "contains factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, __ U.S __, 129 S. Ct. 1937, 1949 (2009).

In making this determination, the Court must "accept as true all of the plaintiff's well-pleaded facts and must draw all reasonable inferences in the plaintiff's favor."  *Gargano*, 572 F.3d at 48-49.  Importantly, the Court is limited to consideration of the allegations in the complaint, with a "narrow exception" for documents central to a plaintiff's claim or sufficiently referred to in the complaint.  *Id.* at 47 n.1.

**FACTUAL ALLEGATIONS**

The following facts, drawing all inferences in plaintiffs' favor, fully support plaintiffs' claims against the DCF defendants.

On Friday, January 11, 2008 Defendant Lynne Reber, an intake screener at DCF, received a call alleging that Child C[1]—Mr. Piccone's three-year-old son—had made statements

---

[1]    Plaintiffs have three children who are referred to in the complaint as Child A, Child B, and Child C.

suggesting that he had been abused by Mr. Piccone. Although the reporter later submitted a written complaint, which essentially repeated the allegations the reporter made during the phone call with Reber, the reporter did not make <u>any</u> allegations against Plaintiff Elena Piccone nor about Child A or Child B, either in the phone call to Reber or in the written 51A report. Incredibly, even though the reporter's allegations did not involve Child A or Child B and did not concern Mrs. Piccone, Reber included in her intake report charges of neglect against Mrs. Piccone with respect to all three of her children and against Mr. Piccone with respect to both Child A and Child B. *See* Complaint ¶¶ 25-30.

Reber knew that the reporter was not a witness to Child C's alleged statements concerning Mr. Piccone and, that in fact, the reporter had not even spoken with Child C about Child C's alleged statements. Similarly, Reber also knew that the people who, according to the reporter, did hear Child C's alleged statements were "mandated reporters"—*i.e.,* they were required by Massachusetts law to report allegations of child abuse to DCF—but that these mandated reporters had not contacted DCF. Moreover, Reber also knew that the reporter had not herself spoken with the people who had supposedly heard Child C's alleged statements. Despite this, Reber failed to include any of this information in her intake report. Reber designated the reporter's complaint an "emergency," meaning that DCF would begin an immediate investigation. *See id.*, at ¶¶ 31-34. Defendant Joan Mazzeo, an area program manager at DCF, reviewed and approved Reber's intake report. *See id.*, at ¶ 35.

Defendant Heather Nietsche and Kathleen Vittum, social workers at DCF, were assigned to investigate the allegations involving Mr. Piccone. At the time, Nietsche was not a licensed social worker in Massachusetts. *See id.*, at ¶¶ 37, 47. She also had no training when it was

appropriate to interview a child nor how such an interview should be conducted. *See id.*, at ¶¶ 48-49.

Nietsche and Vittum arrived at the Piccones' home in Dalton, Massachusetts at approximately 8:30 p.m. They were accompanied by two Dalton police officers. After they identified themselves, Mr. Piccone invited them into his home so that he could learn more about why they were there. Just as Nietsche, Vittum, and the two officers were entering the Piccones' home, Child C entered the kitchen. One of the officers, Sergeant Lawrence Higgins, observed that Child C was "clean and had no sign of injuries." Likewise, Nietsche did not see any signs of abuse on Child C, nor did she believe that Child C was in any immediate danger. *See id.*, at ¶¶ 38-42.

Nietsche and Vittum explained the allegations of abuse to Mr. Piccone. Mr. Piccone adamantly denied the allegations. Nietsche then asked to interview Child C, even though DCF's own regulations provide only that the child be viewed—which Child C already had been by both Nietsche and Sergeant Higgins. *See id.*, at ¶¶ 43-46.

Mr. Piccone agreed to permit Child C to be interviewed on the condition that the interview be videorecorded. Moreover, Mr. Piccone also offered to undress Child C so that Nietsche, Vittum, and the officers could verify that Child C was clean, well-fed, and free from bruises, cuts, scratches, and other indicia of physical or sexual abuse and neglect—again, on the condition that the examination be videorecorded. Mr. Piccone requested that DCF document its investigation by videotaping any interviews and/or examinations of Child C or his other children. *See id.*, at ¶¶ 50-53.

Nietsche refused to permit any interview to be videorecorded, telling Mr. Piccone that "DSS [*i.e.*, DCF] doesn't do video." Nietsche and Vittum then spoke with their supervisor,

Defendant Irene Woods, who conferred with Defendant Lance LaPointe about the situation. Woods and LaPointe approved Nietsche's refusal to permit any interview to be videorecorded. Nietsche also told Mr. Piccone that if he refused to permit an unrecorded interview of all three Piccone children, DCF would take immediate custody of all three children. Upon information and belief, Woods and LaPointe approved this decision. *See id.*, at ¶¶ 54-57.

Nietsche then gave Mr. Piccone an ultimatum: if he did not permit an unrecorded interview of all three children or agree to leave the house for the weekend, DCF would take immediate physical custody of all three children. Upon information and belief, Woods and LaPointe approved the decision to present Mr. Piccone with this ultimatum. Left without any real choice, Mr. Piccone was forced to "agree" to leave his home for the weekend so that DCF would not take custody of his children. *See id.*, at ¶¶ 59-60.

Defendant Nietsche then attempted to force Mr. Piccone to sign an "Interim Service Plan," which is a written document that outlines goals and tasks for families receiving services from DCF. Mr. Piccone refused to sign it; instead, he wrote on it: "I am being forced to sign this agreement or else my three children will be taken this evening to foster care. I offered to completely cooperate on condition that any interaction of my children be videorecorded.  I was told 'DSS [*i.e.*, DCF] doesn't do video.'" Mr. Piccone then left, as did Nietsche, Vittum, and the two Dalton police officers; Mrs. Piccone remained in the home with all three Piccone children. *See id.*, at ¶¶ 61-63.

Mrs. Piccone remained as custodian and caretaker of the three Piccone children with the full knowledge and consent of DCF, including Defendants Nietsche, LaPointe and Woods (and Vittum).  DCF—specifically including Nietsche, LaPointe, Woods, and Vittum—elected to keep the three Piccone children with their mother in their home. During the nearly two hours that DCF

was at the Piccone home on January 11, 2008, no DCF official raised any allegations about Mrs. Piccone or expressed any concerns about leaving the three Piccone children with Mrs. Piccone. Sometime after leaving the Piccones' home, DCF downgraded its investigation from an "emergency" to a "non-emergency." *See id.*, at ¶¶ 64-68.

The next day, Saturday, January 12, 2008, Mrs. Piccone took her children to see Dr. Richard Rosenfeld, a long-practicing pediatrician. She informed him of the allegations and he performed a comprehensive sexual abuse examination of Child C. He called DCF and reported that there were no signs of abuse. *See id.*, at ¶¶ 69-74.

On Monday, January 14, 2008, Mr. Piccone's attorney called Defendant Nietsche to ask for a copy of the complaint against Mr. Piccone. He was told that the report was not yet finalized. Mr. Piccone's attorney also faxed Dr. Rosenfeld's examination notes to DCF and, sometime later that day, Nietsche spoke with Dr. Rosenfeld; he informed her that he had examined Child C and not detected any signs of abuse. *See id.*, at ¶¶ 75-77.

The next day, Mr. Piccone and his attorney met with Defendants LaPointe, Rice, and Nietsche. At the meeting, LaPointe, Rice, and Nietsche acknowledged that DCF had received Dr. Rosenfeld's report. Mr. Piccone again expressed his willingness to permit DCF to interview his children, provided that the interviews were videorecorded. Mr. Piccone also offered to pay for the cost of any recordings, including transcription costs. *See id.*, at ¶¶ 79-81.

LaPointe, Rice, and Nietsche refused to agree to videotape any interviews of the Piccone children. LaPointe, Rice, and Nietsche informed Mr. Piccone that DCF had scheduled a Sexual Assault Intervention Network ("SAIN") interview for the next day, Wednesday, January 16, 2008. LaPointe, Rice, and Nietsche told Mr. Piccone that if he did not cooperate with the SAIN interview and agree to stay out of his home and away from his children "indefinitely," DCF

would have custody of the Piccone children removed to DCF. The meeting ended when LaPointe stood up, held his palms out at his side, and stated that if Mr. and Mrs. Piccone were not going to agree to DCF's demands, then "let's get to it." During this meeting, Mrs. Piccone was—for the first time—accused of neglect but, tellingly, LaPointe, Rice, and Nietsche did not allege a single fact in support of this entirely conclusory accusation. *See id.*, at ¶¶ 83-88.

On Wednesday, January 16, 2008, Defendant Nietsche spoke with the Piccone children's regular pediatrician, Dr. Alan Kulberg.  Dr. Kulberg told Nietsche that he had never had any concerns that any of the Piccone children had been abused. *See id.*, at ¶ 91.

On January 16, 2008, Defendants Nietsche, Rice, and LaPointe conferenced the case with DCF counsel. At approximately 3:00 p.m. that day, Nietsche filed an *ex parte* emergency care and protection petition (the "Petition") with the Massachusetts Juvenile Court seeking to have DCF take custody of all three Piccone children. Upon information and belief, Defendants Rice and LaPointe approved this action. *See id.*, at ¶¶ 94-96.

Nietsche stated in a sworn affidavit in support of the Petition (which was co-signed by Rice, and upon information and belief, had been approved by LaPointe) that all three Piccone children "are without necessary and proper care; that they are growing up under conditions or circumstances damaging to their sound character development; that they lack the proper attention of their parents; and that their parents are unwilling, incompetent or unavailable to provide such care and attention.  [DCF] further requests that the Court find that [DCF] made reasonable efforts, but based upon the <u>emergency</u> nature of the situation, and in order to protection [sic] the children's health and safety, reasonable efforts could not have prevented the need to remove these children" (emphasis added).  *See id.*, at ¶ 98.

In her affidavit (which was co-signed by Rice, and upon information and belief, had been approved by LaPointe), Nietsche knowingly omitted a number of critical facts. Moreover, Nietsche has admitted that the stated basis for the filing of the Petition—*i.e.*, the DCF conclusion of neglect by Mr. and Mrs. Piccone—was unfounded, and that there was no emergency involving the Piccone children during the period January 11-16, 2008 that required court intervention. *See id.*, at ¶¶ 99-100. After reviewing the Petition *ex parte* (and therefore not knowing about the misrepresentations and omissions in Nietsche's affidavit), the Juvenile Court awarded custody of all three Piccone children to DCF. *See id.*, at ¶102.

At approximately 2:00 p.m. on Thursday, January 17, 2008, Defendant Nietsche (accompanied by two Dalton police officers and another DCF social worker) arrived at the Piccones' home with a notice that DCF had filed a care and protection case in Juvenile Court, and that Mr. Piccone was required to attend a hearing in Juvenile Court the next day. Nietsche stated to Mr. Piccone that she (as opposed to DCF) had obtained custody of the three Piccone children. Mr. Piccone asked to see a copy of the order granting DCF custody. Nietsche did not produce the order. While Mr. Piccone was eventually served with a copy of the custody order, Mrs. Piccone was never served with a copy of the order or notice of the care and protection proceeding. *See id.*, at ¶¶ 103-106.

On February 6, 2008, DCF concluded its investigation regarding Mr. and Mrs. Piccone. DCF—specifically Defendants Nietsche and Rice—concluded that there was insufficient evidence to make a finding of abuse or neglect based upon any of the original allegations of abuse or neglect involving Mr. Piccone and Child C. In their written report, Nietsche and Rice concluded that allegations of neglect against Mr. and Mrs. Piccone were "supported" based on the Piccones' supposed failure to make the children available to DCF for an interview. Nietsche

8

and Rice made this finding despite Mr. and Mrs. Piccone's well-documented willingness to permit the Piccone children to be interviewed provided that the interviews were videorecorded. Following the conclusion of DCF's investigation, DCF Defendants LaPointe, Rice, Woods, and Nietsche all failed to bring to the Juvenile Court's attention the results of DCF's investigation, including most significantly, the fact that the original allegations of abuse or neglect were unsupported, and that therefore, there was no factual or legal basis for the care and protection proceeding. LaPointe, Rice, Woods, and Nietsche also refused to present the written conclusions of their investigation to Mr. and Mrs. Piccone for a period of months afterwards, in defiance of Mr. Piccone's repeated discovery requests and several Juvenile Court orders. These discovery abuses denied Mr. and Mrs. Piccone the opportunity to notify the Juvenile Court that there was no basis for DCF's continued legal custody of the Piccone children. *See id.*, at ¶¶ 155-160.

Angelo McClain is the current Commissioner of DCF. He is sued <u>only</u> in his official capacity for, specifically, injunctive and declaratory relief.

## **ARGUMENT**

### I.  **Defendants Reber, Mazzeo, Nietsche, Woods, LaPointe, and Rice are not entitled to Absolute Immunity.**

Absolute immunity from civil liability is reserved for only the rarest cases and, in the context of § 1983 suits, for privileges that were well established when the statute was enacted in the 1871. Absolute immunity is determined by a functional analysis that looks to the nature of the function performed, not the identity of the actor who performed it. The official seeking absolute immunity bears the burden of showing that immunity is justified in light of the function she was performing.

For example, Judges and other court officers are absolutely immune from suit on claims arising out of their performance of judicial or quasi-judicial functions, but not from suits that

arise out of other non-judicial conduct. *See e.g. Forrester v. White*, 484 U.S. 219, 227-29 (1988). Similarly, prosecutors are entitled to absolute immunity for conduct intimately associated with the judicial phase of the criminal process. *See Imbler v. Pachtman*, 424 U.S. 409 (1976). Prosecutors are not, however, absolutely immune when they perform administrative, investigative, or other functions: giving legal advice to the police, holding a press conference, or fabricating evidence. *See Burns v. Reed*, 500 U.S. 478, 494-96 (1991); *McGhee v. Pottawattamie County*, 547 F.3d 922 (8th Cir. 2008), *certiorari granted*, 129 S.Ct. 2002 (2009).

The DCF defendants have asked for absolute immunity exclusively because of their title as "social workers."[2]  The Supreme Court has not had occasion to determine whether there exists such a thing as social worker immunity. Nevertheless, any "official seeking such immunity [] must at the outset show that a 'counterpart to the privilege he asserts' was recognized at common law in 1871, for 'where [the Supreme Court has] found that a tradition of absolute immunity did not exist as of 1871, [it has] refused to grant such immunity under § 1983.'" *Hoffman v. Harris*, 511 U.S. 1060 (1994) (Thomas, J., dissenting from denial of certiorari) *quoting Reed*, 500 U.S. at 498 (SCALIA, J., concurring in judgment in part and dissenting in part). Moreover, there is a presumption that "qualified immunity rather than absolute immunity is sufficient to protect government officials in the exercise of their duties. [The Supreme Court has] been 'quite sparing' in its recognition of absolute immunity and [has] refused to extend it any 'further than its justification would warrant.'" *Reed*, 500 U.S. 486-87, *quoting Harlow v. Fitzgerald*, 457 U.S. 800, 811 (1982). Thus "immunity is justified and defined by the <u>functions</u> it protects and serves, not by the person to whom it attaches." *Forrester*, 484 U.S at 229 (emphasis added).

---

[2]     Defendant Neitsche joins this argument. However, it should be noted that at the time of the alleged conduct, defendant Neitsche was <u>not</u> a licensed social worker.

The First Circuit has not recognized that social workers have absolute immunity. Instead, in similar cases, it has held that, at most, defendants are entitled to qualified immunity. In each case, courts undertake the usual qualified immunity analysis in determining whether there are allegations that the defendants violated plaintiffs' federal constitutional rights and, if so, whether such rights were clearly established. *See Carter v. Lindgren*, 502 F.3d 26 (1st Cir. 2007) *Hatch v. Dept. of Children et al.,* 274 F.3d 12, 20 (1st Cir. 2001); *Strail v. Dept. of Children et al.,* 62 F. Supp.2d 519 (D.R.I. 1999); s*ee Frazier v. Bailey et al.,* 957 F.2d 920, 929 n. 10 (1st Cir. 1992).[3]

The defendants had a non-discretionary duty to "investigate and evaluate" the allegations of abuse and neglect against plaintiffs.[4] *See* M.G.L.c. 119, § 51A. This non-discretionary duty required them to investigate all evidence, both exculpatory and inculpatory. *See Minnehan v. Department of Social Services*, 10 Mass. L. Rep. 364 (1999). There is no doubt that in the context of a Care and Protection proceedings, a social worker in Massachusetts is acting in an investigative capacity. The DCF "investigator"[5] is charged with investigating all reports of abuse. *See* 110 CMR 4.26 (Emergency Reports); 110 CMR 4.27 (Non Emergency Reports). The DCF investigator is analogous to a police officer by being the functionary who searches for clues, evidence, and corroboration that might give him reasonable cause to believe that abuse or

---

[3]     The First Circuit's approach is consistent with that of other circuits. *See e.g. Wilkinson v. Russell et al.*, 182 F.3d 89 (2nd Cir. 1999); *Austin v. Borel*, 830 F.2d 1356, 1361-63 (5th Cir. 1987); *Achterhof v. Selvaggio*, 886 F.2d 826, 830-31 (6th Cir. 1989); *Rogers et al.  v. County of San Joaquin et al.*, 487 F.3d 1288 (9th Cir 2007); *Snell v. Tunnel et al.*, 920 F.2d 673 (10th Cir. 1990); *Fittanto v. Klein*, 788 F.Supp. 1451 (N.D.Ill 1992); *Doe v. County of Suffolk*, 494 F. Supp. 179 (E.D.N.Y. 1980).

[4]     Defendants' only real argument that they are entitled to qualified immunity is that they were performing discretionary functions. Given the regulations concerning their conduct, and the constitutional obligations addressed below, it is unclear what functions they claim are "discretionary" which would immunize them from liability. For example, among other things, their own regulations show they had to first consult with legal counsel before being allowed to even file a care and protection order in court. *See* 110 CMR 9.03 ("When a family which is the subject of a supported 51A report refuses further department services, and if the social worker and/or supervisor wish to seek court ordered custody of the children in question, then a consultation with a Department attorney shall be conducted to determine if there are legal grounds for legal action").

[5]     Defendant Heather Nietsche admitted during a deposition that her official title was "Investigator".

neglect took place. The DCF investigator prepares the affidavit in support of the warrant to remove custody of children in a function directly analogous to that of a police officer preparing an affidavit in support of an arrest warrant.

Defendants have not pointed to any authority that indicates there ever existed a common law right of immunity for social workers or that, at the very least, such a right existed when § 1983 was enacted. It is not even clear "that 'social workers' (at least as we now understand the term) even existed in 1871. If that assumption is false, the argument for granting absolute immunity becomes (at least) more difficult to maintain." *Hoffman*, 511 U.S. 1060 (Thomas, J., dissenting from denial of certiorari). Additionally, plaintiffs' allegations stem largely and mostly from conduct associated with the investigation of the Piccones, conduct which took place before any document was ever filed in court. Defendants have not demonstrated that the conduct complained of was judicial or quasi-judicial; rather, it was wholly investigatory. Their actions were akin to the police investigating a criminal case and immunity, if it exists, should be commensurate with that granted to police. *See e.g. Snell v. Tunnel*, 920 F.2d 673, 691 (10th Cir. 1990) ("child welfare workers investigating claims of child abuse are analogous to law enforcement officer who are entitled only to qualified immunity").

## II.    Defendants Reber, Mazzeo, Nietsche, Woods, LaPointe, and Rice are not entitled to Qualified Immunity.

Plaintiffs have alleged that the defendants violated their constitutional rights and that those rights were clearly established. A reviewing court must employ a two-step analysis: "A court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009). " The 'clearly established' step of the qualified immunity analysis that the second step, in turn, has two

aspects. One aspect of the analysis focuses on the clarity of the law at the time of the alleged civil rights violation . . . The other aspect focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights." *Ibid.*

      *A.     Plaintiffs Have Alleged a Violation of a Constitutional Right*

    "[T]he right to familial integrity 'is plainly of constitutional dimension,' and '[t]he interest of parents in the care, custody, and control of their children is among the most venerable of the liberty interests embedded in the Constitution.'" *Carter*, 502 F.3d at 30, *quoting Hatch*, *274 F.3d at 20 in turn citing Troxel v. Granville,* 530 U.S. 57, 65 (2000). The state's removal of a child from his parents indisputably constitutes an interference with a liberty interest of the parents and thus triggers the procedural protections of the *Fourteenth Amendment*. There are few rights more fundamental in, and to, our society than those of parents to retain custody over and care for their children, and to rear their children as they deem appropriate. *See e.g.  Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Meyer v. Nebraska,* 262 U.S. 390, 399 (1923). The unitary family is the foundation of society. Through the intimate relationships of the family, our children are nurtured, tutored in the values and beliefs of our society, and prepared for life. *See Parham v. J.R.*, 442 U.S. 584, 602 (1979).

     "One aspect of this right is that 'a case worker must have no less than a reasonable suspicion of child abuse (or imminent danger of abuse) before taking a child into custody prior to a hearing'; a 'parent's right to the care, custody, and control of a minor child is inviolate unless a case worker has such a suspicion.'" *Howard v Malac*, 270 F.Supp. 2d 132, 138 (D.Mass. 2003), *quoting Hatch,* 274 F.3d at 22-23.  "[T]he due process clause will certainly be offended if children are taken away from their parents without sufficient investigation." *Strail*, 62 F.Supp. 2d

at 529. "Absent such reasonable grounds, governmental intrusions of this type are arbitrary abuses of power." *Croft v. Westmoreland County Children & Youth Servs.,* 103 F.3d 1123, 1126 (3d Cir. 1997).

Additionally, falsifying or fabricating reports of abuse is also a violation of plaintiffs' constitutional rights. *Howard*, 270 F. Supp.2d at 138-39. When a DCF agent files a petition seeking care and protection, they are acting akin to "a police officer who seeks an arrest warrant by submitting a complaint and supporting affidavit to a judge." *Austin*, 830 F.2d at 1361, *citing Malley v. Briggs*, 475 U.S. 335 (1986); *Snell*, 920 F.2d at 691. If the agent falsifies or fabricates information in the report, they are liable for damages. *Id.* at 1363; *Howard*, 270 F. Supp.2d at 138-39. Indeed, they are liable for "all damages that are the 'natural consequences of [their] actions.'" *Burke v. McDonald*, 572 F.3d 51, 60 (1st Cir. 2009) (finding officer liable when he purposely withheld exculpatory results of a DNA test and, upon that record, defendant was indicted and ultimately convicted).

More troubling is that here, as alleged, not only did the DCF defendants file a false report, they did so in an *ex parte* proceeding which deprived the Piccones of any opportunity to challenge the allegations. Thus, in addition to a substantive due process violation, the DCF defendants deprived the Piccones of procedural due process.

> Due process normally requires notice and opportunity for "some kind of hearing" prior to a final deprivation of liberty or property. This generalization is a very loose one. There are deprivations so limited that no prior "process" is due, *e.g.*, a Terry stop; and conversely, there are requirements of due process in some instances where the "property" interest is pretty thin by conventional standards. Whether the opportunity needs to be furnished before the seizure or whether a post-seizure opportunity is sufficient depends on the circumstances. Where feasible, the opportunity (for obvious reasons) is expected to be pre-deprivation, but this is not always feasible. Two situations in which a post-deprivation opportunity is sufficient [ ]:

> Either the necessity of quick action by the State or the
> impracticality of providing any meaningful predeprivation process,
> when coupled with the availability of some meaningful means by
> which to assess the propriety of the State's action at some time
> after the initial taking . . . satisfies the requirements of procedural
> due process.

*Herwins v. City of Revere*, 163 F.3d 15, 18 (1st Cir. 1998)(citations omitted).

Plaintiffs have clearly alleged a violation of these constitutional rights. The complaint

details allegations that the DCF defendants violated the Piccones' right to family integrity. They

forced the family to split up, giving Mr. Piccone an ultimatum: get out of the house or we will

take the children from you. The conduct occurred before a court hearing and without reasonable

suspicion or a sufficient investigation. Indeed, the conduct continued for days and then weeks.

As more evidence piled up that there was no abuse, the DCF defendants continued to keep the

family apart.

Moreover, plaintiffs also allege that the process used to break apart the family deprived

them of any meaningful way to challenge DCF's actions. First, DCF agents unilaterally decided

to (in effect) remove the children from Mr. Piccone's care by forcing him to leave. They did this

without any formal process: no notice, not right to appeal, etc. More importantly, there was no

reasonable basis to believe there was an emergency. Every DCF agent and police officer who

viewed the children all agreed they looked fine and there were no signs of abuse. In the days that

followed, multiple doctors spoke with DCF indicating that after examining the children, there

were no signs of abuse. Yet, DCF continued to deprive plaintiffs of their constitutional rights to

family unity. As if that were not enough, Nietsche then filed an *ex parte* petition with the court,

full of fabrications and falsehoods, which the Piccones were also unable to contest. She did so at

the behest of her supervisors. These actions perpetuated the ongoing constitutional violation by

assuring the Piccone family would be separated and given no avenue in which to fight the deprivation.

B.     *The Constitutional Right was Clearly Established*

It is beyond doubt that the rights plaintiffs allege the DCF defendants violated were clearly established. As noted, the First Circuit, along with virtually every other sister circuit, have held these rights are ingrained in our legal system. *See Hatch*, 274 F.3d at 23-24; *Strail*, 62 F. Supp.2d at 527-29.

> Given the widespread agreement that has developed as to the applicable legal regime, we conclude that, in the spring of 2000, an objectively reasonable case worker surely would have believed that taking temporary custody of a child prior to a hearing would violate the parents' interest in the child's care, custody, and control if he acted without a reasonable suspicion of child abuse (actual or imminent).

*Hatch*, 274 F.3d at 24.

C.     *Defendants' Conduct Was Not Objectively Reasonable*

The parameters in which the DCF defendants were operating were well defined. Constitutionally, the DCF defendants were not entitled to remove the children from the family unless there existed "no less than a reasonable suspicion of child abuse (or imminent danger of abuse) before taking a child into custody prior to a hearing." *Hatch,* 274 F.3d at 22-23. Even DCF's own policies establish that intervention is only allowed when "it is <u>clearly needed</u> to protect a child." *See* 110 CMR 1.02 (2) (emphasis added). The case law is replete with examples in which, if the conduct alleged here is true, the conduct would be objectively unreasonable. *See e.g. Strail,* 62 F. Supp.2d 519.

Besides the objectionable conduct described in other cases, which should have put the DCF defendants on notice of what was, and was not, permissible, the DCF defendants were bound by regulations and ethical constraints which provide the contours for how an objectively

reasonable social worker would be expected to act. Like all investigative affiants before a court, a Massachusetts social worker—like a police officer—has a duty of candor to the court in their written submissions of warrants and Care and Protection Petitions, respectively. The defendants all had an unqualified duty of candor to the judge of the juvenile court to report all evidence, both exculpatory and inculpatory, in order for the judge to fairly ponder the question of whether to take the extreme step of placing plaintiffs' children into the dangerous and unhealthy foster care environment. For example, 258 CMR 20.01, titled "Unethical or unprofessional Conduct in General" states:

> A social worker shall not engage in unethical or unprofessional conduct. "Unethical or unprofessional conduct" includes, but is not limited to, the following:
> . . .
> 3. Engaging in, authorizing, or aiding or abetting fraud, deceit, misrepresentation of material facts, the provision of false or forged evidence, or bribery in the course of his or her professional practice.
> . . .
> 8. Engaging in any conduct which violates federal or state law and which reasonably calls into question his or her fitness to practice social work.
>
> 9. Engaging in any conduct which violates the civil or legal rights of a client; or,
>
> 10. Engaging in any course of conduct which is expressly prohibited by, or which constitues a failure to conform to: (a) any provisions of the National Association of Social Workers, as adopted by the 1979 NASW Delegate assembly and amended from time to time thereafter, to the extent that said provision is not inconsistent with federal or state law;

The wealth of ethical and state laws prohibiting a social worker from presenting false, incomplete and misleading information in an affidavit in support of a petition to remove children in an *ex parte* setting should prohibit this court from finding that any reasonable social worker would not be aware of their duty of candor to the Juvenile Court. The duty of candor is especially important in *ex parte* settings, such as the filing of a Care and protection setting.  In

circumstances almost identical to the function performed by a police officer in seeking an arrest warrant, neither the children nor the parents, *i.e.* the persons affected by the investigators actions, are present to represent their interests. Instead the court must rely exclusively on the evidence presented in the petition. The failure of a social worker to include materially exculpatory information in the petition denies the court the evidence necessary to make an informed decision on whether to remove custody of children from their parents.

No reasonable social worker could believe that the best interest of the child will be served by withholding material information from a judge making the *ex parte* decision whether to place a child in foster care, *e.g.* that a local, well respected, board certified pediatrician had cleared the child of sexual abuse within 24 hours of allegations of abuse being made. No reasonable social worker would characterize parents as being uncooperative for not allowing their children to be interviewed unless the interview was videotaped, when the Appeals Court of Massachusetts recommend that such interviews be recorded, *see Commonwealth v. Upton*, 59 Mass.App.Ct. 252, 255, 795 N.E.2d 575, 578 (2003), and DSS's own rules require that these interviews be videotaped. No reasonable social worker would swear in an *ex parte* petition for removal of three children to foster care that both parents were believed to be unfit when there existed, at most, only factual allegations against one of the parents because the irreparable damage caused by the forcible removal of children from their parents is recognized by Massachusetts law. *See* 110 CMR 4.29(1) (Before arriving at a decision to effect an emergency removal, the investigator shall consider the harm to the child that such removal inevitably entails). Where the DSS has an absolute duty to put the children's interests above all else, and where the children have an absolute right to be free of abuse, then such a duty of candor is required.

**III.    Defendant Angelo McClain, the present Commissioner of DCF, is the appropriate party to sue when seeking injunctive relief against a Commonwealth Agency**.

As defendant McClain concedes, state officials can be sued in their official capacity in order to request injunctive or declaratory relief. *See* Defendants' Motion to Dismiss, pg. 13. Indeed, "consistent with the *Eleventh Amendment* . . . federal courts may, notwithstanding the absence of consent, waiver or evidence of congressional assertion of national hegemony, enjoin state officials to conform *future* conduct to the requirements of federal law." *Lane v. First Natl. Bank of Boston*, 871 F.2d. 166, 172 n.5 (1st Cir. 1989), *quoting Ramirez v. Puerto Rico Fire Service*, 715 F.2d 694, 697 (1st Cir. 1983) (emphasis supplied); *see Ex Parte Young,* 209 U.S. 123 (1908). "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. PSC*, 536 U.S. 635, 645 (2002), *quoting Idaho* v. *Coeur d' Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring in part and concurring in judgment). Moreover, the court should not "confuse[] liability with remedy. Although Plaintiffs' allegations are rooted in events that occurred in the past, the injunctive and declaratory relief that they seek would prevent future and ongoing illegality. The *Eleventh Amendment* poses no bar to Plaintiffs' claims for prospective relief." *Porter v. Jones*, 319 F.3d 483, 491 (9th Cir. 2003).

In the instant case, although Plaintiffs' allegations stem from past conduct, they are seeking prospective injunctive relief to prevent DCF from continuing to violate their Federal Constitutional rights. Plaintiffs were not given a chance to contest the allegations of abuse. Despite the care and protection petition being dismissed, their names are contained with DCF databases. Thus, Plaintiffs are seeking that DCF expunge all records relating to them or their children from their database and any additional databases arising from charges of abuse, neglect,

and kidnapping. While the liability that gave rise to this ongoing violation already occurred, injunctive relief is the only vehicle in which to remedy the continued wrongful classification of the Piccones as child abusers or kidnappers. Indeed, DCF references their database for any investigation and, as it stands now, would be free to use this illegally obtained information in the future. This is precisely the sort of prospective relief available by way of injunction against state officials in their official capacities.

IV.    **The Individual Defendants' Actions were Threatening for Purposes of the Massachusetts Civil Rights Act.**

Defendants seek dismissal of all counts alleging a violation of plaintiffs' claims under the Massachusetts Civil Rights Act ("MCRA"), G.L. c. 12 § 11I, primarily because, as they argue, their conduct was not "threatening." However, by actually separating the family, threatening and then actually bringing a care and protection petition, and consistently threatening action unless and until the Piccones' complied with DCF requests, the defendants' conduct falls squarely under the prohibitions of the MCRA.

Violation of the MCRA requires that the interfering conduct be accomplished through threats, intimidation, or coercion. "The term 'threats, intimidation and coercion' may take on many forms." *Reproductive Rights Network v. President of Univ. of Mass*, 45 Mass.App.Ct. 495, 506, 699 N.E.2d 829, 838 (1998), *quoting United States v. Beaty*, 288 F.2d 653, 656 (6th Cir. 1961). A "'threat' . . . involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. 'Intimidation' involves putting in fear for the purpose of compelling or deterring conduct. . . . [Coercion involves] 'the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done.'" *Planned Parenthood League of Mass., Inc. v. Blake*, 417 Mass. 467, 474, 631 N.E.2d 985 (1994) (citations omitted); *Reproductive Rights Network*, 45 Mass.App. Ct. at

505, 699 N.E.2d at 837. "Courts apply an objective standard, asking whether a reasonable person in the plaintiff's circumstances would be 'threatened, intimidated, or coerced' by the defendant's conduct." *Three-A Sac Self-Storage, LP v. Gregg P. Lisciotti et al.*, 24 Mass.L.Rep. 613 (2008), *citing Planned Parenthood League of Massachusetts, Inc.*, 417 Mass. at 474-75, 631 N.E.2d at 985.

For example, sending police officers to seal off a building where a lawful meeting was to take place was a threat; the show of police inferred that if the plaintiffs did not do what they were told, they would be arrested. *Reproductive Rights Network*, 45 Mass.App.Ct. at 507; 699 N.E.2d at 838. Even the use of lawful process can be an improper threat, or inherently intimidating, if done to make someone act in way they otherwise would not. *See Three-A Sac Self-Storage*, 24 Mass.L.Rep. 613. Thus, filing criminal charges against a person shortly after he threatened to sue the police could constitute a threat: "The close nexus between [plaintiff's] threat to sue and the filing of charges supports the jury's verdict that the defendant filed charges in an effort to intimidate the plaintiff into dropping any possible claims." *Britton v. Maloney*, 981 F.Supp. 2d 25, 56 (D. Mass 1997).

The facts alleged here demonstrate that Defendants all acted in a threatening and intimidating manner. Several encounters with Mr. Piccone involved the Dalton police. Indeed, when Mr. Piccone was given an ultimatum about either leaving the home or having his children taken, it was done with two Dalton police officers looming in the background. Later, defendants continued to threaten to take the children away if the Piccones did not cooperate. For example, when Plaintiffs would not agree to defendants' demands, LaPointe stated "let's get to it," indicating that they would use the care and protection proceeding to get what they wanted. Indeed, Neitsche already admitted the care and protection petition was unfounded. That could

only mean the petition was filed for a different reason—to intimidate and coerce Plaintiffs into cooperating. Defendants' conduct during the entire incident was meant to make the Piccones do what they wanted through any means possible. Whether using the police or the care and protection proceedings, the allegations make a case for a violation of the MCRA.

## V.     The Individual Defendants Are Liable for Abuse of Process because they had an Ulterior Motive

Defendants argue that the abuse of process claims should be dismissed because there are no allegations that process was used for an "ulterior or illegitimate purpose." Plaintiffs' complaint does indeed raise such allegations and, if presumed true, readily supports a finding that the Defendants' motives were impure.

"To prevail on a claim for malicious prosecution, a plaintiff must establish that he was damaged because the defendant commenced the original action without probable cause and with malice, and that the original action terminated in his favor." *Chervin v. Travelers Insurance Company,* 448 Mass. 95, 103, 858 N.E.2d 746 (2006). "Improper purpose" exists where the defendant "'institut[es] a civil proceeding when [it does] not believe [its] claim be to meritorious' or [does] so to 'forc[e] a settlement that has no relation to the merits of the claim'" *Three-A Sac Self-Storage*, 24 Mass.L.Rep. 613, *quoting Chervin,* 448 Mass. at 110, 858 N.E.2d 746, *in turn quoting* Restatement (Second) of Torts, §676 cmt. c (1977).

Plaintiffs' allegations, if true, would support a finding of an improper purpose. Plaintiffs allege that DCF initiated the aggressive and unwarranted intrusion into their family in retaliation for Mr. Piccone's work assisting an attorney defend a day care center in Pittsfield against allegations of abuse and neglect. *See* Complaint ¶ 23. Mr. Piccone had communications with the General Counsel of the Department of Early Education indicating that he would be filing a lawsuit against them and DCF. *See id.* at ¶ 24. Just one week later, DCF came knocking on Mr.

22

Piccone's door. *See id.* at ¶ 25. The allegations imply that DCF was retaliating against Mr. Piccone in an effort to intimidate him to refrain from suing them.

Additionally, Nietsche admitted that when she filed the care and protection against the Piccones—something she did with the approval of her supervisors—that the allegations in the care and protection petition were unfounded and there was no reason to believe court involvement was necessary. That admission alone supports the fact that the process was filed without probable cause and for an improper purpose. If the facts stated in the petition were unfounded, then the only reason the petition was filed was to either retaliate against Plaintiffs for Mr. Piccone's threat to sue DCF or for their unwillingness to "cooperate" with the DCF investigation on DCF's terms. Either way, the filing of the care and protection petition was done for an improper purpose.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' McClain, Reber, Mazzeo, Nietsche, Woods, LaPointe, and Rice's, motion to dismiss.

Respectfully submitted,

LOUIS PICCONE and ELENA PICCONE,

By their attorneys,

/s/ Eric Tennen
Eric Tennen (BBO #650542)
John G. Swomley (BBO # 551450)
Scott A. Katz (BBO # 655681)
SWOMLEY & ASSOCIATES
227 Lewis Wharf
Boston, MA 02110
617.227.9443

Dated: December 30, 2009

23

**<u>Certificate of Service</u>**

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, which includes counsel for all Defendants in this matter.

                            /s/ Eric Tennen
                            Eric Tennen